78 N.J. Super. 117 (1963)
187 A.2d 628
IN THE MATTER OF THE ADOPTION OF D.
Superior Court of New Jersey, Union County Court, Probate Division.
Decided January 11, 1963.
*119 Mr. Clyde M. Noll for the plaintiffs (adopting parents) (Messrs. Bourne, Schmid, Burke & Noll, attorneys).
Mr. Sol L. Kesselman for petitioners (natural parents).
BARGER, J.C.C.
This is an adoption proceeding. A preliminary hearing was held on January 24, 1962. The natural parents appeared pro se at the preliminary hearing and indicated a desire to withdraw their written consents to the adoption and sought the return of the child to them. As a result of this hearing and the findings resulting therefrom, an order was entered which, among other provisions, appointed a next friend, terminated the parental rights and duties of the natural parents, and fixed the date of the final hearing on October 24, 1962. This hearing has been held.
The child concerned, a girl, was born June 22, 1958, and is one of five children, ranging in age from two to seven years, born to the natural parents. The natural parents were married in Germany while the father was stationed in that country in military service. Upon their return to this country, and his discharge from military service, the natural parents took up residence in this State.
As the result of marital conflict and discord, financial difficulties and the father's excessive use of intoxicating liquor, the natural parents in the summer of 1961 began to give some thought and consideration to separating as husband and wife; and the natural mother testified that she, at least, began considering the placing for adoption of some of the children in order to avoid for them the hardships which she felt would ensue from such separation. The court is not satisfied that this was the real reason her thoughts turned *120 towards adoption, but rather concludes from all of the evidence that it was because of her parental and domestic attitude and deportment during this period that adoption was thought of as a solution to lighten and relieve her of some of the burdens of motherhood and the resulting parental duties and obligations incident thereto. The evidence indicates that family responsibility and routine, insofar as care of the children was concerned, was somewhat distasteful to her. She would often go to a friend's home, leaving the children alone until her husband returned from work, and on at least one occasion for two days absented herself from the home. In any event, through a friend who testified at the preliminary hearing, the natural mother in the summer or fall of 1961 indicated a desire to place two of the children for adoption. The friend then mentioned this desire to the adopting father and another with whom she was acquainted through her employment. Arrangements were made for the surrender of the child here concerned to the adopting father on October 11, 1961. A written consent was signed by the natural parents, and the care and custody of the child was given to the plaintiffs. The adopting father took the child from the natural mother at her residence and to his home. The natural father was also present. The natural parents have not seen or made any attempt to see the child since that date. Another child was surrendered to other adopting parents, and adoption proceedings are pending in another county.
The court is satisfied from the evidence that the consent referred to was executed understandingly, voluntarily and with reflection. The adopting father appeared with the consent prepared and indicated to the natural parents its general purpose, and the natural parents executed the written consent at a nearby bank, in the presence of the adopting father. At the time of the execution of the consent the intention of the natural parents was to separate because of their marital discord and the conditions generally existing in the marriage referred to previously. In view of this expressed intention to separate, the natural parents felt that this was a *121 proper step to take for the best interests of the child concerned in order to relieve themselves of their parental duties and obligations. The evidence indicates that the natural mother was more of this mind than the natural father.
As a result of the testimony at the preliminary hearing the court found that there was uncleanliness and disorder in the home of the natural parents, and there was mistreatment and neglect of the children born of the marriage. Specifically, the testimony indicates that there was a total lack of daily routine, insofar as the children were concerned, as to meals, sleeping habits, dressing, education and play activities; there was a lack of attention by the natural mother to the normal routine of the children, and the natural mother appears to have had a dislike for household duties generally. There was a lack of guidance and discipline was solely of a physical nature; there did not appear to be the proper family environment present conducive to the happiness and security of the child concerned. There was ample evidence to support the factual findings of the court at the preliminary hearing.
The natural parents since the preliminary hearing have filed a petition under R.R. 4:112-6 seeking to vacate the preliminary order and seeking the return of the child. They allege that at the time of their consent they were confused; that the female friend of the natural mother influenced their judgment; that their parental attitude and marital conditions since such hearing have undergone a change, and that they are now desirous of assuming fully their parental duties and obligations to the child. In other words, as parents they have reformed. The admission of this alleged reformation to some degree supports the findings made at the preliminary hearing.
There is no jurisdictional question involved. Further, the child and the adopting parents meet all of the eligibility requirements of the statute. No question is raised relating to the fitness of the plaintiffs as adopting parents; in fact, the reports of the agency as next friend adequately support such *122 fitness and further indicate fully the normal and progressive adjustment and happiness of the child in her new home and family environment. The hoped for bonds of affection now have been fully established.
There are no financial considerations or comparisons involved. The issue, therefore, is whether or not the best interests and welfare of the child will be served by the court's recognizing the expressed desire of the natural parents and vacating the preliminary order returning the child to them.
At the commencement of the final hearing the plaintiffs objected to the court's including in the final hearing evidence relating to the allegations of the petition referred to and filed by the natural parents seeking a vacating of the preliminary order and the return of the child to them. The plaintiffs claimed that the preliminary order was a final termination of the parental rights and duties of the natural parents and was dispositive of that issue.
The question to be dealt with first, therefore, is the finality of the determination under the preliminary order. R.R. 4:112-5(a), referring to the preliminary order, appears to support finality. It provides:
"The rights, duties, privileges and relations theretofore existing between the child and each natural parent or other custodian or guardian theretofore appointed for such child shall be in all respects at an end." (Emphasis added.)
Also, N.J.S.A. 9:3-24, subd. A(2) provides for a determination at the preliminary hearing as to the status of the parents of the child with respect to further rights of custody. The finality reasoning has some further support in the statutory provision that a final hearing may be dispensed with and judgment entered forthwith if there has been a preliminary hearing and the next friend appointed has recommended the adoption, N.J.S.A. 9:3-27, subd. A.
However, the sense and intent of a law or rule is determined as indicated by the following language in State v. Brown, 22 N.J. 405, 415 (1956):
*123 "The sense of a law is to be gathered from its object and the nature of the subject matter, the contexual setting, and the statutes in pari materia."
In Adams v. Adams, 53 N.J. Super. 424, 429 (App. Div. 1958), certification denied 30 N.J. 151 (1959), the court pointed out the following:
"On the other hand, an interlocutory judgment is defined as one `given in the middle of a cause on some plea, proceeding or default which is only intermediate and does not finally determine or complete the suit. * * *'"
That the order entered after a preliminary hearing is interlocutory in form is indicated in In re Adoption by B, 63 N.J. Super. 98, 102 (App. Div. 1960), in the following language:
"`Consents to adoption have been supplanted by investigation and report of an approved agency and review by the court at a preliminary hearing held to consider the entry of an interlocutory order,' and `Under the present adoption act, written parental surrenders of custody of children for adoption purposes are recognized only when given to an approved adoption agency.'" (Emphasis added.)
Further, if the preliminary order is considered final as to the termination of parental rights, duties and obligations, then there would be no reason for the enactment of R.R. 4:112-6 which provides for petitions for modification or revocation, and the rule would be meaningless. This rule follows immediately after the rule on a preliminary hearing (R.R. 4:112-4) and on the order upon preliminary hearing (R.R. 4:112-5), and immediately before the rule on final hearing (R.R. 4:112-7), and specifically refers to the word "order." The court concludes from a reading of all the statutory and rule provisions, considering the nature of the proceedings and the subject matter, that it is not the intention of the statute or the rules to make the preliminary order or any other order prior to final hearing final, and that such orders retain their interlocutory nature. The preliminary *124 order should not, of course, be considered lightly when based on factual findings supported by the evidence. The court notes that we are not here concerned with fraud or duress, nor are we concerned with the violation of any public policy as expressed by the statute N.J.S.A. 9:3-17, or any other overreaching practice or condition which would perhaps affect the legality of the order. It is noted that in N.J.S.A. 9:3-17(b) it is one of the purposes of this statute to protect the natural parents from hurried or abrupt decisions to give up a child. The objection of plaintiffs is therefore overruled.
The court, as previously indicated, is satisfied that the consent of the parents was based on their considered judgment, voluntarily and freely given, and does not fall within the hurried or abrupt classification indicated in the statute, though given under the personal stress of their contemplated separation. The court points out that the surrender of parental duties was under consideration by the natural parents from the summer of 1961, and had been previously discussed by the natural mother with the adopting father, and also with the friend of the natural mother. The consent of the natural parents, where no approved agency is involved, is, of course, no longer required under the statute. Such a consent is a circumstance for consideration by the court in its final determination of what is for the best interests and welfare of the child concerned, In re Adoption by B, supra. The weight to be given will vary according to the circumstances under which given. The rights of natural parents cannot and should not be ignored. It cannot be considered a light matter to give judicial sanction to the varying of a natural parent-child relationship. The best interests of the child are an important factor and the overriding one. In those cases where the person who gave the child life is asserting a desire not to part with his or her own flesh and blood, care and caution must be exercised. As expressly stated in N.J.S.A. 9:3-17(a) and (b), it is necessary and desirable to protect the child from unnecessary separation from his or her natural parents and, as indicated, to protect the natural *125 parents from hurried or abrupt decisions. All of these things seriously affect the future of the child concerned. The court here is faced with the expressed desire of the natural parents, shown by the withdrawing of their parental consent, to have the child returned to them. This change has come about because of their determination not to separate and their supposed personal reformation.
The cardinal principle in adoption cases, and one recognized down through the years, is that the best interests and welfare of the child are controlling. This must be the guiding rule, since it is the child's life and future that is more involved than that of the natural or adopting parents. Insofar as it is humanly possible, emotions must give way to this basic rule. In effect, what the court must do is to predict the future of the child; because of the finality of the act, every caution and deliberation must be exercised. These cases, of course, are fraught with emotion.
The medical testimony indicates that shortly after the surrender of the child to the adopting parents the child was very aggressive; her behavior pattern was unusual; her actions were not normal for a child of her age, and her vocabulary was extremely limited and below that of a child of her age. Her attitude and behavior were described by the doctor who testified as that of a caged animal. This witness further testified that as time passed, further examinations indicated considerable improvement in her attitude and behavior pattern. At the last visit and examination the child was a happy child, much less aggressive and more friendly. The reports of the agency as next friend indicate that the initial attitude and behavior have completely disappeared and that the child is normal for one of her age; that she is now a happy child and completely and happily adjusted to her present family environment.
The natural parents now claim they have personally changed; that the instability and uncertainties existing in their marriage at the time of the surrender have been overcome; that they now have a full and complete understanding *126 of the duties of parenthood and its responsibilities, and that they have a deep love and affection for the child concerned and sincerely desire to bring the child back into their family environment. This change, if it did take place, occurred between October 1961 and January 1962, as the parents indicated a measure of this reformation at the preliminary hearing which, as indicated previously, took place on January 24, 1962. This is a short period of time for such a radical change to have taken place, both with regard to the stability of the marriage and the recognition by the natural parents of their parental duties and obligations. What brought about this supposed change is not clearly indicated by the evidence. Can the court rely upon the representations of the natural parents? In view of the fact that their testimony is uncorroborated, the change is left in the realm of their mental intent. In determining the future of the child the court cannot escape the past, nor can it ignore that past. The court is not satisfied or convinced of the sincerity of the reformation of the natural parents to a sufficient degree to take a chance with the future of the child concerned.
Where a consent is voluntarily, freely and understandingly given, with a resolution to abandon parental rights, it appears to this court unreasonable to hold that parents can arbitrarily, merely by an expression of intent indicating an attitude of change towards their parental obligations and duties, withdraw such consent and expect the court to return the child concerned to them. This seems especially true where in reliance upon the consent the child's entire status has changed, as has the status of the adoptive parents who have proceeded in good faith to make the child a part of their family group and have adequately provided for the child. Certain bonds of affection have developed, and the child's adjustment to her new home and family environment is normal and fixed; her memory of the past, because of her tender age, has substantially diminished or completely disappeared. Under such circumstances, it is indicated to this court that such status should not be uprooted and her future *127 welfare and happiness left to chance, based on a hope that the natural parents have now marital stability and a full recognition of their parental duties and obligations.
This court is satisfied that the best interests and welfare of the child concerned will be served by allowing this adoption and a judgment may be presented accordingly.