MARGARET SEES, PLAINTIFF-APPELLANT, v. CHARLES
K. BABER AND JERRI BABER, DEFENDANTS-RESPON-
DENTS.

Argued May 10, 1977—Decided July 27, 1977.

Mr. *William C. Bochet* argued the cause for appellant (*Messrs. Dobrin, Muscarella, Saunders* and *Bochet*, attorneys).

Mr. *Bernard L. Albert* argued the cause for respondents (*Messrs. Cole, Berman* and *Belsky*, attorneys).

The opinion of the court was delivered by

HANDLER, J. This is an action by an unmarried mother for the return of her child whom she had surrendered to defendants for adoption. The events critical in this litigation unfolded quickly. The child was born on July 3, 1976; a consent for adoption was executed on July 6th; the next day the baby was surrendered to the custody of defendants; two days later on July 9th, the mother told the doctor and defendants' attorney that she had changed her mind; within a few days her request for the return of the child was refused. On July 22, 1976, she instituted this action in the Chancery Division of the Superior Court in Passaic County seeking immediate return of the child.

On July 30, 1976, the return date of an order to show cause which had issued, the court set the matter down for a plenary hearing on August 9, 1976. Prior to the hearing, defendants filed an answer alleging that they had started

an action for adoption in Essex County.[1] They also counter-claimed that plaintiff had forsaken her parental rights. On August 9, 10 and 11, 1976, a plenary hearing was held, and on August 27, the judge issued an opinion and an order for judgment denying the relief sought by plaintiff and granting judgment in favor of defendants on their counterclaim, terminating plaintiff's parental rights in the child. Plaintiff filed a notice of appeal on August 30, 1976. The Appellate Division affirmed the final judgment on January 17, 1977. Plaintiff then filed a petition for certification and a motion for acceleration on February 10, 1977, which were granted on March 1, 1977. 74 *N. J.* 251 (1977).

Plaintiff Margaret Sees became pregnant in November 1975 when she was nineteen years of age. She was living with her family at the time, but did not disclose her pregnancy to anyone until June 9, 1976 when she told her mother. That day, she and her mother went to see the family doctor. A week later, on June 16, 1976, Ms. Sees registered at the prenatal clinic of St. Joseph's Hospital. She there met one Margaret Willoughby, a case worker, to whom plaintiff stated she planned to give her child for adoption. Miss Willoughby explained different adoption procedures and offered

---

[1]The separate adoption proceedings were started in Essex County by defendants on July 16, 1976, soon after they had been informed that plaintiff sought the return of her child. Plaintiff was not aware of the institution of this action at the time her complaint for the return of the child was filed in Passaic County. An order for preliminary hearing in the Essex County matter was entered on July 16, 1976. The order and complaint were served on plaintiff on August 16, 1976, after the plenary hearing in the custody action was completed. Plaintiff filed a motion before the Chancery Court in Passaic County to stay the pending adoption proceedings. On the return date of the motion, September 17, 1976, the judge denied the stay for jurisdictional reasons. On September 21, 1976, plaintiff appeared on the return date of the preliminary hearing in Essex County and the court there entered an order staying the adoption proceedings until final determination of the custody appeal. The court ordered the parties to apply to the Appellate Division to have the appeal heard as an emergent matter.

assistance. Apparently, as a result of her efforts, plaintiff was later contacted by a representative of an unspecified "state adoption agency."

On June 30, 1976, Ms. Sees and her mother met Dr. James P. Thompson, the director of the Department of Obstetrics and Gynecology of St. Joseph's and a private practitioner in this specialty. Plaintiff informed Dr. Thompson it was her intention to relinquish the child for adoption. He advised her of alternate means of placing the child for adoption. He also asked plaintiff and her mother not to make any decision at that time but to think about it and to call back when a decision was made. On the next day, July 1, 1976, Dr. Thompson received a call from plaintiff's mother stating that plaintiff had made a decision to give up the child for adoption through private placement.

Within two days of this meeting, on July 3, 1976, plaintiff gave birth to her child. Dr. Thompson assisted with the delivery. The court determined that both plaintiff and her mother had been advised by the doctor that plaintiff had no commitment to surrender the child unless she clearly elected to do so and that she could have counselling. Dr. Thompson further testified that he anticipated the mother would be discharged on July 7, and therefore he made the arrangements for the surrender of the child to coincide with this "conventional" discharge date.

Three days after the birth of her child, on July 6, 1976 (coincidentally her twentieth birthday), plantiff had several meetings with Judith De Spirito, a nurse recommended by Dr. Thompson, specializing in the care and counselling of new mothers. At the first visit this witness found plaintiff to be happy and alert. When asked if she was sure that she wanted to give the child for adoption, plaintiff responded affirmatively. At the second meeting on that day she took plaintiff to the nursery to see the child. Mrs. De Spirito told plaintiff it would be harder to give up the child than to keep him. Plaintiff responded it was in the best interests of the baby to give him up.

An attorney representing the adopting parents met with plaintiff at the hospital that day, July 6th. Dr. Thompson had told plaintiff earlier that as a "formality" a lawyer for the adoptive parents would visit her. It so happened that Dr. Thompson knew this attorney previously, as well as the defendants, whom he had told of the availability of the child. The attorney presented a document (a written consent for the adoption) for her examination and review. Prior to plaintiff's execution of it, the document was explained to plaintiff paragraph by paragraph, and subsequently reviewed again with plaintiff and her mother when her mother joined the meeting. The lawyer explained to both plaintiff and her mother that the provision relating to "consent" meant that plaintiff was abandoning any and all rights to the child. He also informed plaintiff that she personally would have to turn the child over to the adopting parents. The attorney further advised plaintiff as to the adoption procedure, indicating that she would be served with pleadings in the adoption action and that the adoption procedure would take one year to become final. He mentioned that there would be hearings but he did not tell plaintiff or her mother, contrary to plaintiff's testimony, that she had 20 days to contest the proceeding after service or that she had a right to change her mind after executing the document.

At the time of plaintiff's discharge on July 7th, the following day, Mrs. De Spirito explained to plaintiff the manner in which she would have to identify her child and turn him over to the adoptive parents. She said plaintiff had no questions concerning the procedure and did in fact surrender the child. Plaintiff handed her baby to defendants in the hospital parking lot.

Within two days of her discharge, plaintiff changed her mind. Dr. Thompson was called by plaintiff's mother on July 9th and was told that plaintiff wanted her baby back. On receiving this call, Dr. Thompson said "within an hour" he called defendants' attorney to tell him. The attorney was also told by plaintiff's mother on that very day that plaintiff

wanted her baby back. The defendants were themselves informed that plaintiff wanted the return of her baby. The request, as noted, was refused.

Based upon factual findings, the trial judge concluded

* * * that the decision of plaintiff to relinquish her child for adoption was not made on the spur of the moment but was one which was first considered by her in June, as early as June 9, 1976, when she discussed the matter with her mother * * * followed by a series of conversations and consultations * * *. There is no testimony or evidence in this case of fraud, coercion, undue influence, over-reaching or pressure which was imposed upon plaintiff to make this decision. * * * [P]laintiff's consent was based upon her considered judgment and was not hurried, abrupt or given under personal stress. * * * * * * [T]he totality of plaintiff's conduct both prior to and at the time of the physical surrender of the child, constituted a forsaking of parental rights and obligations. * * * [B]y the weight of the evidence in this case, of which J–1 [the executed consent] is but a part * * * at the time of the surrender of the child on July 7, 1976, plaintiff relinquished her parental obligations. The fact that plaintiff had a change of mind just two days later does not in my opinion alter this finding.

The Appellate Division affirmed substantially for the reasons expressed by the trial court. It was convinced that ample credible evidence supported the lower court's detailed findings and since this in great part involved an evaluation of the credibility of witnesses, it did not disturb the conclusion that "plaintiff voluntarily undertook to surrender the child and forsake her parental rights and obligations." Though it had not been raised at the plenary hearing, the Appellate Division addressed the further issue of whether the direct surrender of the child under the circumstances and the physician's conduct were in violation of the adoption laws and therefore invalidated the mother's consent and surrender. The court concluded that there was no statutory interdiction against the legal validity of a direct surrender of a child by its parent to prospective adoptive parents and that "* * * the direct relinquishment of the child to defendants without the intervention of an appropriate placement agency does not constitute a violation of the Adoption Act

nor serve as a basis for invalidating the voluntary and understanding surrender and consent to adoption."

We reverse. It was error for the courts below to have concluded under these circumstances that plaintiff had abandoned or forsaken her child and that her parental rights in her child should be terminated.

I

The parties have proceeded, and the matter is before us, within the context of our statutes governing adoptions. *N. J. S. A.* 9:3–17 to *N. J. S. A.* 9:3–36. The result of the decision below is that plaintiff would have no further custodial rights in her child. This relief was based on defendants' answer and counterclaim which projected their claims as prospective adoptive parents and sought a termination of plaintiff's parental rights in the child. The resultant determination was intended to be conclusive upon the parties in the separate adoption action, then pending but stayed, in Essex County. It thus had the statutory effect of a determination terminating parental rights rendered in a preliminary hearing pursuant to *N. J. S. A.* 9:3–24. Reflecting this, the final order of the trial court authorized defendants to proceed with the adoption action in Essex County, and the Appellate Division itself ruled that "the judgment below is controlling [in the pending adoption proceeding] on the issue of voluntary surrender and the natural parent's forsaking of parental rights and obligations."

Under the adoption laws, if the child sought to be adopted has been privately placed, as in this case, that is, the youngster has not been received into an adoptive home under the supervision of an "approved agency" as defined by *N. J. S. A.* 9:3–18(a), a preliminary hearing must be conducted. *N. J. S. A.* 9:3–23A(1). One of the purposes of the preliminary hearing is to determine whether a natural parent should have "[any] further right to custody of the child." *N. J. S. A.* 9:3–24C; *In re Adoption of Children by D.,* 61

*N. J.* 89, 94 (1972).[2] In effect, the termination of the rights of the natural parent is a condition precedent which must be met before an adoption can proceed to finality. *In re Adoption of J.,* 139 *N. J. Super.* 533, 538–539 (App. Div. 1976), rev'd on other grounds on dissent below. 73 *N. J.* 68 (1977); *In re Adoption by R. D.,* 127 *N. J. Super.* 311 (App. Div.), certif. den. 65 *N. J.* 292 (1974).

Under the adoption statute, parental rights may not be terminated unless it is determined by the court that a parent suffers from a specific statutory disability or has engaged in parental conduct amounting to "forsaken parental obligations." *N. J. S. A.* 9:3–24 C. There is no suggestion in this case that plaintiff suffers any disablement enumerated in the statute. Thus, her parental rights may be severed only if she has "forsaken parental obligations," the phraseology in fact used by the trial court to express its ultimate conclusions and reiterated by the Appellate Division in its affirmance.

The statutory standard of "forsaken parental obligations" is itself legislatively defined as: "willful and continuous neglect or failure to perform the natural and regular obligations of care and support of a child." *N. J. S. A.* 9:3–18(d). This definition, it has been observed, requires "a past course of conduct amounting to intended abandonment or very substantial neglect of both parental duties and claims, with no reasonable expectation of any reversal of that con-

---

[2] Where a child has come into a home without the approval of an approved agency, the court upon the filing of a complaint for adoption must "appoint an approved agency * * * to make an investigation and written report to the court concerning the circumstances under which the child was received into the home of the plaintiff, [and] the status of the parents of the child * * *." *N. J. S. A.* 9:3–23A(4)(b). At the preliminary hearing the determination of whether a parent has "forsaken parental obligations" should be based on "the report of the approved agency and the evidence presented * * *." *N. J. S. A.* 9:3–24C. The court below did not appoint an approved agency for purposes of conducting such an investigation and making a report for its consideration.

duct in the near future." *In re Adoption of Children by D.; supra* 61 *N. J.* at 94–95.

In the present case, it is obvious that the mother's consent to the adoption and the actual surrender of her baby to the adoptive parents were crucial acts on her part which impelled the court to conclude that she had abandoned the child and forsaken parental claims. It is important, therefore, to examine the special role which "consent" and "voluntary surrender" have been assigned by the Legislature in the statutory scheme for the adoption of children.

In the first adoption act in New Jersey, *L.* 1877, *c.* 383 and its early revision, *L.* 1902, *c.* 92, consent was a requirement for an adoption. Such consent provisions were carried forward in considerable detail in subsequent revisions and amendments. *L.* 1905, *c.* 149; *N. J. S. A.* 9:3–4 (*R. S.* Cum. Supp. 1937, repealed by *L.* 1953, *c.* 264); *L.* 1938, *c.* 355; *L.* 1940, *c.* 210; *L.* 1944, *c.* 239; *L.* 1951, *c.* 104; *cf. In re Schult,* 14 *N. J. Super.* 587 (Cty. Ct. 1951). Until the enactment of our current adoption act in 1953, the consent of natural parents to the adoption of their children was considered the primary statutory ground for adoption. See, *e.g.; Stawicky v. Stawicky,* 12 *N. J. Super.* 72, 76 (App. Div. 1951). The doctrine of abandonment or constructive abandonment evolved as an alternative basis for the termination of parental rights in situations where consent was unavailing or unobtainable. In such cases "abandonment" became an equivalent or substitute for consent, embracing "any conduct" reflecting "a settled purpose" to repudiate parental status. *Winans v. Luppie,* 47 *N. J. Eq.* 302, 305 (E. & A. 1890); *Wood v. Wood,* 77 *N. J. Eq.* 593 (E. & A. 1910). The concept of abandonment foreshadowed the later statutory standard of "forsaken parental obligations." *In re Jacques;* 48 *N. J. Super.* 523, 531–532 (Ch. Div. 1958); Note, 16 *Rutgers L. Rev.,* 379, 391 (1962); *L.* 1938, *c.* 355, § 3.

Under present law, parental consent was eliminated as an independent or alternative statutory basis for adoption, at

least with respect to private or non-agency placements. Nevertheless, the status of the natural parent in an adoption proceeding remained firmly established. *In re N., 96 N. J. Super.* 415 (App. Div. 1967); *In re Adoption of Children by D., supra; cf. In re Adoption of J., supra.* Despite the elimination of parental consent as a basis for adoption in a private setting, it was evident that the protection of the rights of natural parents was a concern of the Legislature. Senate Committee on Institutions and Agencies, *Public Hearing on Senate Bill No.* 235 (1953), pp. 3, 18–19. Different techniques for preserving the interests of the natural parents were fashioned. Instead of parental consent as an independent condition for adoption, the Legislature substituted the broad standard of "forsaken parental obligations," and imposed judicial scrutiny and the requirements for approved agency investigations and preliminary hearings, as the basis for terminating parental rights. *Report of the Advisory Committee on the Revision of the Child Adoption Statute of New Jersey* (1953), § IV (6), p. 3; *In re Jacques, supra* at 527; *In re N., supra* 94 N. J. Super. at 421.

■■ The Legislature carefully circumscribed the factors of consent and voluntary surrender in adoptions. Only where an adoption proceeds on the basis of a placement with an approved agency may consent and surrender become a statutory basis for terminating parental rights. A surrender of the custody of a child is not valid unless made to an approved agency. *N. J. S. A.* 9:2–14. The voluntary surrender of custody of the child to the approved agency by the natural parents shall be valid whether or not the person giving such consent is a minor; also it shall be irrevocable except at the discretion of the approved agency or if it is set aside by the court for fraud, duress or misrepresentation. *N. J. S. A.* 9:2–16. The statute provides very specifically the manner in which such a voluntary surrender shall be accomplished: it must be in writing and contain the declaration that the person executing the surrender is knowingly and understandingly relinquishing custody and terminating parental

rights in favor of the agency; the surrender "may include a statement that its purpose is to permit the approved agency to place the child for adoption by such person or persons as the approved agency may select." *N. J. S. A.* 9:2–17. If the court then determines that the child was in fact voluntarily surrendered pursuant to those statutory provisions, it may declare that such person shall have no further right to the custody of the child. *N. J. S. A.* 9:3–19.1; also, *N. J. S. A.* 9:2–18 to 20; *In re Adoption by B.*, 63 *N. J. Super.* 98, 102 (App. Div. 1960); *In re T.*, 95 *N. J. Super.* 228, 236–237 (App. Div. 1967).

 In contrast, neither consent nor voluntary surrender is singled out as a statutory factor in terminating parental rights where an adoption stems from the unregulated private placement of a child, such as occurred here. Rather, the statute directs that the forfeiture of parental prerogatives must be based on the more embracive standard of "forsaken parental obligations."

In the setting of a private placement, several New Jersey cases have dealt with consent and surrender for adoption as factors in determining whether there had been a statutory forsaking of parental obligations. The approach followed in these cases was expressed in *In re Adoption by B., supra* 63 *N. J. Super.* at 103:

Although consent is no longer a jurisdictional prerequisite in private adoption proceedings, it may have relevance in the frame of reference of possible abandonment or the forsaking of parental obligations. *Cf. Lavigne v. Family and Children's Society of Elizabeth*, 11 N. J. 473 (1953). Whether the consent, or its attempted withdrawal, should be given any weight in determining if the adoption should be allowed, would depend on a variety of circumstances, such as the conditions under which the consent was originally given, the length of time between the giving and the withdrawal of the consent, the extent of reliance on the consent by the potential adoptive parents, and the development of the child while in their custody.

In none of the decisions was there a forfeiture of parental rights based solely upon a consent and surrender without there being present significant additional conduct evidencing

abandonment or relinquishment of parental status. *In re Adoption by R. D., supra; In re P., and wife,* 114 *N. J. Super.* 584 (App. Div. 1971) ; *In re Adoption by B., supra; In re Adoption of D.,* 78 *N. J. Super.* 117 (Cty. Ct. 1963) ; *A v. M,* 74 *N. J. Super.* 104 (Cty. Ct. 1962). This is true even though some of the cases laid considerable emphasis upon the element of consent. For example, in *In re Adoption of a Child by R. D., supra,* the court was concerned primarily with the contention that the asserted consent had not been knowingly and voluntarily given. It ruled that "normal emotional distress of a surrendering parent or the inherent pressures of a situation involving the giving up of her child by an unwed mother shortly after its birth" were not sufficient to impugn the surrender of a child otherwise made without coercion or duress. 127 *N. J. Super.* at 319. Though not stressed, the evidence indicates that more than six months prior to the birth of her child the mother considered putting it up for adoption, and after having done so at about the time of its birth, she raised no objection for six more months and then only when formal adoption proceedings were instituted. Thus, the pattern of conduct spelled out a purposeful relinquishment of parental claims by the mother. Similarly, in *In re Adoption of D.,* 78 *N. J. Super.* 117, *supra,* several months prior to the surrender of the child to adoptive parents, the natural parents contemplated adoption, and after giving up the child, they made no effort to withdraw their written consent until the preliminary hearing was scheduled some two months later.

In *In re P., and wife, supra,* the court went so far as to state that "where the natural parent * * * voluntarily, freely and understandingly gives consent, with a present resolution to abandon parental rights, that consent should be irrevocable and binding, absent fraud or some overriding equitable consideration, and assuming that such a result is not inimical to the welfare of the child." 114 *N. J. Super.* at 591–592. That declaration went considerably beyond the facts of that case which we would emphasize as equally im-

portant: despite having been advised shortly after the surrender of her baby to adoptive parents of the date fixed for a preliminary hearing, the natural mother did not communicate her change of mind for approximately two months and then did nothing to assert her claim to the child until the actual hearing. In contrast, here plaintiff changed her mind within two days of giving up her child; defendants were immediately advised of this; and legal action for the return of the child was initiated swiftly by plaintiff — less than three weeks after the birth of the child. Moreover, the issue was miscast by the court in *In re P., and wife,* when it characterized the consent as "irrevocable and binding." The consent there had no statutory significance. Consent, as we have pointed out, may be fixed as a statutory brace for terminating parental rights only in voluntary agency placements. But, in an unsupervised private placement, since there is no statutory obligation to consent, there can be no legal barrier to its retraction.

It seems to us significant that in only a handful of other jurisdictions does it appear that the consent to a surrender or adoption by a natural parent is considered absolutely irrevocable, and then usually when it is given pursuant to statutory or judicial strictures. Annotation, "Right to withdraw consent to adoption," 74 *A. L. R.* 3d 421 (1976). Despite differences in statutory treatment, there are illustrative cases in other jurisdictions similar to the cited New Jersey decisions. *E.g. Williams v. Pope,* 281 *Ala.* 416, 203 *So.* 2d 271 (1967); *In re Holman,* 80 *Ariz.* 201, 295 *P.* 2d 372 (1956); *Batton v. Massar,* 149 *Colo.* 404, 369 *P.* 2d 434 (1962); *In re Adoption of Cannon,* 243 *Iowa* 828, 53 *N. W.* 2d 877 (1952); *Lee v. Thomas,* 297 *Ky.* 858, 181 *S. W.* 2d 457 (1944); *In re F,* 26 *Utah* 2d 255, 488 *P.* 2d 130 (1971); compare, *People ex rel. Kropp v. Shepsky,* 305 *N. Y.* 465, 113 *N. E.* 2d 801 (1953); *People ex rel. Scarpetta v. Spence-Chapin Adoption Service,* 28 *N. Y.* 2d 185, 321 *N. Y. S.* 2d 65, 269 *N. E.* 2d 787, *cert.* den. and appeal den. 404 *U. S.* 805, 92 *S. Ct.* 54, 30 *L. Ed.* 2d 38 (1971); *In re D. L. F.,*

85 *S. D.* 44, 176 *N. W.* 2d 486 (1970). The matter was succinctly put in *In re Nicky,* 81 *Misc.* 2d 132, 364 *N. Y. S.* 2d 970, 975 (Surr. Ct. 1975), aff'd (App. Div. November 24, 1975, unreported).

Many decisions consider the revocation of "surrender instruments" and "consents". Although these decisions articulate general principles — "the primacy of the status of the natural parent"; "the fitness, competency and ability of the natural parents to maintain, support and educate the child"; "the best interests of the child"; — a key factor in all of the decisions in which revocation has been allowed is the fact that the natural parent has "an early change of mind" soon after the surrender or consent: *contra* however where there has been a long delay or equivocation and indecision on the part of the natural parents. Delay is evidence of a settled purpose to surrender the child: it is as well harmful to the well-being of the child.

■ The court below, on challenged testimony, determined as a fact that plaintiff did form an intent to relinquish her child prior to his birth and that her consent and surrender of the baby for adoption were knowing, voluntary and deliberative acts on her part. Although the reliability of such a consent and surrender in the context of an unstructured private placement is open to grave question, we accept the court's factual finding. *State v. Johnson,* 42 *N. J.* 146 (1964). We do not share its ultimate conclusion, however, that this resulted in the abandonment of the child, or in a forsaking of parental obligations. The court's peripheral perspective of the problem was sharply constricted because, closing one eye as it were, it effectively disregarded plaintiff's immediate change of mind and prompt, diligent attempts to regain the child. These factors were entitled to great weight; they were accorded none. In consequence, the resulting conclusion was at odds with the reality of the record, which, from a wider vantage point, discloses that plaintiff neither abandoned nor relinquished her child.

■ Our conclusion in this respect is buttressed by the important fact that the adoption was attempted through an unsupervised and unregulated private placement of the child.

The thrust of the legislative approach is to ·encourage adoptions through approved agencies. *Lavigne v. Family & Children's Soc. of Elizabeth,* 11 *N. J.* 473, 482 (1953). Approved agency adoptions are designed to protect natural parents from precipitous decisions. They serve as well the interests of adoptive parents and the welfare of the child. *State v. Wasserman,* 75 *N. J. Super.* 480, 489 (App. Div. 1962), aff'd o.b. 39 *N. J.* 516 (1963).

There is no question that the obverse, the private direct placement of children for adoption, is very much disfavored. Under our statutes, criminal sanctions may be invoked against a person who places, offers to place or in any manner assists in the placement of a child in a home of another for purposes of adoption unless the adoptive person is a brother, sister, aunt, uncle, grandparent or step-parent of the child. *N. J. S. A.* 2A:96–6 and 7. A parallel provision in the adoption act itself prohibits such private placements by unauthorized individuals. *N. J. S. A.* 9:3–19. The legislative onus upon this conduct is intended to inhibit the private direct placements of children for adoption, other than with close relatives, in order to extinguish the nefarious practices associated with the so-called black and grey market in babies. *State v. Wasserman, supra* 75 *N. J. Super.* at 488–489; *State v. Segal,* 78 *N. J. Super.* 273, 285 (App. Div.) certif. den. 40 *N. J.* 224 (1963).[3] Even in the grey market in adoptions,

[3] A proposed revision and repeal of the adoption law, *Senate No.* 1631 (1976), preserves the distinction between approved agency placements and private placements. That bill has currently passed the Senate and is awaiting action in the Assembly. LXIV *N. J. Legislative Index,* S–44 (June 27, 1977). According to the Statement to *Senate No.* 1631 (with Senate Committee amendments, April 28, 1977), the bill "enumerates important differences between independent and approved agency adoption." The bill contains criminal and civil prohibitions against participation in adoption placements by anyone other than an approved agency or relative. Under § 19, in a private placement, prospective adoptive parents, who are not related to the child, must file before their adoption complaint is heard, a detailed, verified report disclosing all financial

where typically a doctor or lawyer acts as an intermediary or go-between in the placement of children, as in this case, there are serious dangers for all concerned, the child, the natural parents and the adoptive parents, as well as the public. Kadushin, *Child Welfare Services,* (2 ed. 1974), p. 562; Katz, "Law of Adoption," 51 *Geo. L. J.* 64, 65–66 (1962). The grey market is oriented to the desires of the adoptive couple rather than to the needs of the child or its natural parents. Kadushin, *supra* at 562–563; Fradkin, *The Adoption Home Study* (1963), pp. 53, 76; see also, Assembly Committee on Institutions, Public Health and Welfare, *Public Hearings on Assembly Bill No.* 236 (1961) p. 6. (This bill would have prohibited direct or private placements except to relatives). This dichotomy between private and agency placements has been recognized elsewhere. *E.g. Stotler v. Lutheran Social Service of Iowa,* 209 *N. W.* 2d 121, 74

aspects of the placement. Senate Law, Public Safety and Defense Committee, *Public Hearing on Senate Bill No.* 1631 (Adoption Revision), pp. 3, 6 (Feb. 23, 1977).

With respect to our earlier discussion concerning the significance of consent and surrender and the status of a natural parent, the bill continues certain basic approaches of the present law. Thus, in a voluntary agency placement, there are similar statutory provisions for the execution of a formal consent and surrender and its binding effect. There is no requirement for either consent or surrender in connection with a private placement. The bill requires the termination of parental rights as a condition for final adoption. The standard for terminating parental rights, according to the most recent Senate Committee amendment, is set forth in these terms: "A judgment of adoption shall only be entered over an objection of such [natural] parent * * * upon a finding by the court after a plenary hearing that such parent has failed willfully and substantially to perform the regular and expected parental functions of care and support of the child or whose actions would, in an appropriate action, have justified the termination of his parental rights." *Senate No.* 1631, § 10A (Senate Committee amendment), *supra.* We realize that the proposed legislation, even if enacted, would not be determinative as to the intent of the current adoption act. *Cf. Edwards v. Mayor etc. of Borough of Moonachie,* 3 *N. J.* 17, 24 (1949). The consistency of philosophy between the present and the proposed adoption laws is significant, however, as an expression of continuing public policy in the adoption field.

*A. L. R.* 3d 476 (Iowa 1973); *In re David,* 256 *A.* 2d 583
(Me. Sup. Jud. Ct. 1969); *Petition of Gonzales,* 330 *Mich.*
35, 46 *N. W.* 2d 453 (1951); *Ex parte Schultz,* 64 *Nev.* 264,
181 *P.* 2d 585 (1947); *In re Hildenbrand,* 405 *Pa.* 579, 176
*A.* 2d 900 (1962); *Catholic Charities of the Diocese of Galveston Inc. v. Harper,* 161 *Tex.* 21, 337 *S. W.* 2d 111 (1960).
See also, Comment, 28 *U. Chi. L. Rev.* 564, 570 (1961).

The dangers inherent in private placements are underscored in this very case. The only time plaintiff saw Dr. Thompson prior to the birth of her baby was on June 30, 1976. The doctor testified, however, that he did not at this meeting consider himself to be plaintiff's doctor but rather professed to be acting as the head of a medical department of the hospital. The doctor's allegiance to plaintiff was further blurred because defendants were his social friends. He also acknowledged that his main concern was plaintiff's physical condition since she was overdue and that the primary purpose of this visit was to give her a medical examination. Moreover, he admitted he was not knowledgeable in the state's adoption laws but he still gave his opinion as to the relative advantages to the private placement of a child for adoption. One such benefit was private medical care without expense. He also told plaintiff she would "know" the adoptive parents through a private placement, although plaintiff, in no sense, came to know the defendants or their qualifications for parenthood. Dr. Thompson also arranged for plaintiff to meet with defendants' attorney, describing this as a mere "formality." The attorney did not suggest that plaintiff obtain independent legal advice or any other form of counselling. He admitted the consent document had been completed with information furnished by Dr. Thompson and that a portion of the document—a statement that the plaintiff was unable to care for her child — was just an assumption on his part. He also explained certain critical language therein, to wit, "I voluntarily give my consent and execute my appearance in the Essex County Court for the adoption of said child." Although this language is not free from am-

biguity, the attorney told plaintiff it meant that she consented to the adoption and it constituted a relinquishment or abandonment of her rights in the child.

It may be that the doctor and lawyer, who acted as intermediaries, were highly motivated and well-intentioned. We assume they were. This, however, does not lessen the risk of an ill-advised and inappropriate placement of a child. "Good intentions cannot be a substitute for careful and complete investigations." Note, 16 *Rutgers L. Rev., supra* at 405; *cf. Matter of Anonymous (G), Misc.* 393 *N. Y. S.* 2d 900 (Surr. Ct. 1977); also, Witmer, Herzog, Weinstein and Sullivan, *Independent Adoptions* (1963), pp. 359–360.

In sum, it is clear from this record that plaintiff had promptly repudiated her consent to the adoption of the child, and without delay, in a diligent and concerted fashion attempted to regain her child, all within three weeks of his birth. Though her consent and surrender for adoption were voluntary and understanding when undertaken, they did not become fixed or immutable before plaintiff changed her mind just two days later. Accordingly, after plaintiff demanded the return of her child, there was no justifiable reason for defendants to have retained the child. Under such circumstances, plaintiff did not exhibit the willful and continuous neglect or failure to respond to parental duties, as required by the adoption statute, in order to constitute forsaken parental obligations and claims. Hence the decision to terminate her parental rights was in error and must be reversed. In so ruling, this obviates our consideration of the further issue raised by plaintiff, and decided by the Appellate Division, as to whether the private placement of the child constituted an illegal act and should be set aside on grounds of invalidity.

## II

Neither the courts below nor the parties have been called upon to consider the issue which we now address. It having been determined that plaintiff's parental rights in

her child are not to be terminated, is she entitled to the immediate return and custody of her child? We here decide that it is appropriate under the circumstances of this case to direct the return of the child to his mother without further proceedings.

We endorse the view expressed in *In re Adoption of Children by D., supra,* that if there has not been "established upon a thorough consideration of all the evidence" a statutory forsaking of parental obligations, "the rights of a natural parent may not be cut off, adoption must be denied at that point and the case should proceed no further" (61 *N. J.* at 95). That being so, we are entirely satisfied that there is no statutory or legal basis upon which to deny or resist plaintiff's claim *qua* parent to the full custody of her child. It is possible, however, for facts to arise in a given setting which might obtrude upon what is otherwise a clear legal picture in favor of a natural parent, and move the court to exercise its equitable powers pursuant to its *parens patriae* jurisdiction with respect to the custody of the child.

Such a case is *Sorentino v. The Family and Children Society of Elizabeth,* 72 *N. J.* 127 (1976). There we ordered a plenary hearing to be conducted to determine the potential danger of serious and permanent injury to the well-being of a child which might result from a change in custody. The facts and circumstances of that case, however, are readily distinguishable from those here. The Sorentino child was almost three years old and had lived with the adoptive parents uninterruptedly from the time she was one month old. That circumstance itself would deter this court from ordering the immediate return of the child to her natural parents — complete strangers as far as the child is concerned — without some factual inquiry, assisted by expert testimony, as to any discernible or demonstrable impact that such a move might have upon the child. To do otherwise, in effect, would be to proceed blind. In taking that approach we were mindful that the child had reached a level of cognition, intelligence and perception to make such a hearing and such an

inquiry meaningful. It comports with common, human experience that a child of that age over such a long period of time would have developed a strong and fast relationship with the adoptive parents and that there could be serious, perhaps irreparable, harm to the youngster's psyche if that relationship were abruptly and permanently ruptured.

These considerations do not obtain in this case. Indeed, we are prompted to dispense with any further hearing because it would not likely add illumination or help us to know truly what is right and wise to do. We would expect at such a hearing that there would be testimony to the effect that a filial relationship takes root in the earliest stages of child development and that this cannot be destroyed or changed without some risk of emotional harm to the child. It has been recognized that the psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood. Goldstein, Freud and Solnit, *Beyond the Best Interests of the Child* (1973) ; see also Bowlby, *Attachment and Loss* (Vol. I, 1969; Vol. II, 1973) ; Note, "Alternatives to 'Parental Right' in Child Custody Disputes Involving Third Parties," 73 *Yale L. J.* 151 (1963) ; Comment, 26 *Rutgers L. Rev.* 693 (1973) ; and see, Note, 3 *Seton Hall L. Rev.* 130, 140 (1971). The insuperable difficulty, however, is that the nature and duration of such psychological damage are imponderable, at least where an infant is involved. There is simply no firm basis to conclude that an inquiry focusing upon the existence of "psychological parenthood," in a case such as this, with an infant just one year old, would be at all helpful or productive in deciding whether that child could not now be raised adequately and decently by his own mother without ruinous psychological trauma. That far truth is still beyond our ken. Okpaku, "Psychology in Child Custody Cases," 29 *Rutgers L. Rev.,* 1117 (1976); Comment, 26 *Rutgers L. Rev., supra* at 699– 700, n. 41, 702; Michaels, "The Dangers of a Change of Parentage in Custody and Adoption Cases," 83 *L. Q. Rev.*

547, 566–568 (1966); see also, P. Strauss and J. Strauss, Book Review, 74 *Col. L. Rev.* 996 (1974).

It does not otherwise appear that the welfare of the child will be undermined by his return to his natural mother. The fitness of the plaintiff is a relevant factor, of course, in determining whether she is entitled to custody. In this case there was testimony establishing that fitness and the ability of the plaintiff to take proper care of her child. The trial court understandably made no finding with respect to the fitness of plaintiff to exercise her parental responsibilities, but we have no hesitancy on the record before us to prevent further delay, and in the exercise of our original jurisdiction, *R.* 2:10–5, in determining that she is able to assume her role as a parent. It may be pointed out that this facet of the case likewise is in contrast to *Sorentino,* where there was concern as to the stability and constancy of the natural parents in terms of assuming their parental obligations. Moreover, that plaintiff here might theoretically suffer by comparison with defendants in terms of the material advantages which could be conferred upon the child is not germane, since there is not the slightest suggestion that any such deficiencies that might be attributed to plaintiff would render her unfit or unable to raise him. *Cf. Doe v. G. D.,* 146 *N. J. Super.* 419 (App. Div. 1976), aff'd *sub nom. Doe v. Downey,* 73 *N. J.* 52 (1977).

At this phase of the proceedings, we deal with the question of custody in the context of an adoption action, which has now been aborted. Nevertheless, while the welfare of the child remains the paramount and overriding concern, all of the interests staked out in various provisions of the adoption statute, including those of the natural and adoptive parents, should be considered in *pari materia. N. J. S. A.* 9:3–17; *cf. In re Adoption of a Child by R. D., supra* 127 *N. J. Super.* at 319. There is no intimation that defendants in this matter have not proceeded in good faith or are not genuinely interested in the welfare of the child they sought to adopt. Perhaps out of ignorance, and certainly with no

attribution of fault, defendants did not take the child for adoption from a person either related or known to them, or through an approved agency or person expert and objective in the delicate subject of adoption. Rather, they chose to rely upon a doctor, who was a social acquaintance, and a lawyer, neither of whom was competent or expert in the manifold and subtle complexities that impinge upon an adoption. Thus, the very circumstances under which defendants obtained the physical custody of the child bespoke unreliability. This factor — the method of placement — has some impact on the deeper question of whether the custodial claims of the natural mother do not outweigh those of defendants. Comment, 26 *Rutgers L. Rev., supra* at 711–712. Additionally, on bringing the child home, defendants were confronted immediately with an entreaty from his mother for his return. At that juncture, there was no impediment to their returning the child to the mother. The only obstacle to that course of action was their own stronger, self-centered desire to keep the baby. There assuredly was then no reasonable or substantial reliance which would render it unfair to return the child to his mother.

Again *Sorentino* is distinguishable. In that case, the unwed mother clearly considered giving up her child for adoption and retained custody of the child only for one month. She was in frequent consultation with an approved agency. She in fact consented to the adoption and surrendered her child, although, we have ruled this was not a voluntary act on her part. Nevertheless, from the standpoint of the adoptive parents, they had no reason to believe that the surrender of the child was not valid or that the consent thereto was not irrevocable as generally provided by statute. In addition, notwithstanding the objections later raised by the mother and father, no legal action was instituted for the return of the child for more than a year. The adoptive parents thus relied upon the conduct of the natural parents, with the further encouragement and assurance of an approved agency. Reasonably secure in the custody of the

child, they gave as fully as possible their love, emotions, time and wherewithal to the child. In consequence, with resultant delays abetted by litigation, a parent-child relationship was permitted to grow and to flourish. The natural parents by their own conduct contributed measurably to this result. *Cf. In re Jacques, supra* at 48 *N. J. Super.* 533; *Winans v. Luppie, supra,* 47 *N. J. Eq.* at 305.

In holding as we do that there should be an immediate return of the child to the plaintiff without any further hearings, we are sensitive to the goals and objectives of our adoption laws. Among the purposes of that law is "to protect the child from unnecessary separation from his natural parents" and "to protect the natural parents from hurried or abrupt decisions to give up the child." *N. J. S. A.* 9:3–17(a), (b). We have earlier noted that the status and interests of the natural parent were concerns reflected in the adoption law. *In re Adoption of Children by D., supra; In re N., supra; In re Jacques, supra;* also, Ketchum and Babcock, "Involuntary Termination", 29 *Rutgers L. Rev.* 530, 532–534 (1976). The right of a family to be a family has been consistently acknowledged. *Smith v. Organization of Foster Families for Equality and Reform,* —— *U. S.* ——, 97 *S. Ct.* 2094, 53 *L. Ed.* 2d 14 (1977); *Stanley v. Illinois,* 405 *U. S.* 645, 651, 92 *S. Ct.* 1208, 31 *L. Ed.* 2d 551 (1972); *cf. Moore v. City of East Cleveland, Ohio,* 431 *U. S.* 494, 97 *S. Ct.* 1932, 52 *L. Ed.* 2d 531 (1977).

By our ruling, we conceive that the adoption act is being "administered so as to * * * promote policies and procedures which are socially necessary and desirable * * *." *N. J. S. A.* 9:3–17. It would be unfair and wrong, under these circumstances, to deny or delay the return of plaintiff's child. To reiterate, there is involved here the private placement of a child for adoption by a mother who had no independent legal advice or professional counselling; she promptly tried to undo the surrender and she diligently took action for the child's return. We have determined that her parental rights cannot therefore be terminated. That being so, the

restoration of her child should not be forestalled since there is no reason grounded in ordinary experience to believe that this child predictably would suffer permanent and serious psychological injury, the child being barely one year old, and there is no suggestion that the mother is otherwise unfit or unable to rear the child.

Accordingly, consistent with this opinion we order the immediate return of the child to plaintiff with full and exclusive rights of custody. In order to assure the prompt transfer of the child, the matter is remanded to the trial court which is hereby instructed to secure compliance with this directive without delay. No costs.

SULLIVAN, J. (concurring). I am in full agreement with the majority opinion but wish to make the following observations. Our Adoption Act permits a parent to make a private placement of a child for adoption but then requires that in such case, as one of the prerequisites to adoption, the court make a finding that the parent has "forsaken parental obligations." This is a misnomer. In my opinion, the Legislature has misconceived the real issue. The question is not whether the parent has forsaken parental responsibility but rather whether the parental surrender was voluntary with full knowledge and understanding of the consequences.

I think that all placements for adoption should be required to be through an approved adoption agency. However, as long as the statute permits private placements, it should at least articulate what the real issue is. Moreover, in the case of a private placement, I would give the parent the absolute right, within a reasonable time as fixed by the Legislature, to void the surrender and recover the child back.

CLIFFORD, J. (dissenting). The arguments marshalled by the majority in support of its reversal of the judgment terminating plaintiff's parental rights are persuasive, as is the analysis of the underlying law upon which that deter-

mination is based. But I am left with a nagging misgiving that in attempting to ameliorate a result which it feels is harsh, the Court has not only visited tragic consequences upon the child involved here but has also done a disservice to others who may in the future find themselves in the unfortunate position of these parties. No longer can there be any certainty when a natural mother freely, voluntarily and understandingly surrenders her child, as did Margaret Sees, with a present resolution to abandon rights and obligations in and to the child, that at some future date the arrangement may not be undone.

Such a condition of uncertainty tends to raise in the natural parents false expectations that they can simply have a change of heart or mind and reclaim the child, while at the same time dooming the putative adoptive parents to a state of suspense, waiting for the knock on the door that signals the end of their parenthood. While it is true that only two days elapsed in this case before plaintiff sought to renege on her voluntary agreement to surrender (preceded, as it was, by counseling and information from a doctor, a nurse, a caseworker and an attorney), the fact remains that the child involved is now almost 13 months old and a complete stranger to his natural mother as, more importantly, she is to him. See *n. 2, infra.* If the arrangement can start to become unravelled after two days, what about after two weeks? Two months (see *In re Adoption by P.,* 114 *N. J. Super.* 584 (App. Div. 1971))? Longer? The potential for disruption implicit in these uncertainties seems to underlie the concerns, which I share, expressed by the court in *In re Adoption of a Child by R. D.,* 127 *N. J. Super.* 311, 319 (App. Div. 1974);

If the normal emotional distress of a surrendering parent or the inherent pressures of a situation involving the giving up of her child by an unwed mother shortly after its birth were held sufficient, months later, to vitiate an otherwise voluntary decision, few surrenders for adoption by unwed mothers would stand. See *In re Surrender of Minor Children,* 344 *Mass.* 230, 181 *N. E.* 2d 836, 839

(Sup. Jud. Ct. 1962) ; *In Re Adoption of F.*, 26 *Utah* 2d 255, 488 *P.* 2d 130, 131, 134 (Sup. Ct. 1971).

But, I repeat, the arguments to the contrary of this position, as set forth in the opinion of the Court, have considerable force. Were this the only point of departure from the majority viewpoint, I might ordinarily incorporate my reservations in a concurring opinion.

However, on a different phase of the case I find myself in profound disagreement with the majority. For even if the courts below were in error in reversing the judgment terminating plaintiff's parental rights, it does not at all follow that as an immediate — even abrupt — consequence of today's decision the only child these defendants have ever had should be wrenched from the only home he has ever known, and this without so much as a by-your-leave of a *Sorentino* hearing to determine whether such an obviously drastic change will be accompanied by "the probability of serious harm to the child," *Sorentino v. Family & Children's Soc. of Elizabeth*, 72 *N. J.* 127, 133 (1976) — a hearing, incidentally, readily conceded by plaintiff's attorney at oral argument before us to be not inadvisable. Were we adjudicating rights in a '57 Plymouth or an egg-beater, we would not give such short shrift to a hearing.[1] Certainly no less solicitude and protection should attend the disposition of flesh and blood.

This is, unhappily, one more situation[2] calling for this

[1] The analogy, while imperfect, is not entirely inapposite. It is clear that secured creditor has a right to reclaim chattels, subject to the security, from a defaulting debtor. However, when in the exercise of that right the creditor utilizes the power of the state to secure the chattel, due process requires a hearing on the issue of the asserted right. *Fuentes v. Shevin*, 407 *U. S.* 67, 80–81, 92 *S. Ct.* 1983, 32 *L. Ed.* 2d 556, 570 (1972).

[2] We seem recently to be encountering a spate of cases, most of them requiring Solomon-like judgment, in which this Court is called upon to make custody determinations. See *Sorentino v. Family & Children's Soc. of Elizabeth*, 72 *N. J.* 127 (1976) ; *Doe v. Downey*, 73 *N. J.* 52 (1977). This is unfortunate not so much on account

Court's exercise of its *parens patriae* jurisdiction with respect to the custody of this child. I see the case as indistinguishable in principle from *Sorentino, supra,* which the Court undertakes to differentiate. While readily acknowledging that a *Sorentino* hearing would produce testimony to the effect that "a filial relationship takes root in the earliest stages of child development and this cannot be destroyed or changed without some risk of emotional harm to the child," and that "the psychological aspect of parenthood is more important in terms of development of the child and its mental and emotional health than the coincidence of biological or natural parenthood," *ante* at 222, the majority then veers off the track by concluding that none of this applies — or can be established — with respect to an infant just one year old, presumably because common experience is to the contrary.

But I do not understand either "common experience" or the weight of scientific authority to be to that effect at all. As far as "common experience" is concerned, I suppose all we have to go on is our own fallible perceptions of what is good or bad for a child of this age. Mine differ from the majority's, *cf. Small v. Rockfeld,* 66 *N. J.* 231, 253 (1974) (Clifford, J., dissenting), and based thereon I can conclude only that the course definitively charted by the Court may very well put this child in shoal waters. As for authority, much of the literature on the subject expresses serious doubts about the advisability of effecting a transfer of custody after a child has achieved an age of 4 to 6 months.[3] This infant,

---

of the complex or emotion-laden character of the cases as because the judicial machinery has thus far proven incapable of avoiding the unhappy consequences brought on by the passage of time required for litigation to run its course. See *Sorentino, supra,* 72 *N. J.* at 132. One can only hope that with the clarification these decisions should bring to this area of the law, the cases henceforth may be expeditiously and correctly decided so as to minimize the movement of children from one home and family to another.

[3]See J. Bowlby, 1 *Attachment and Loss* 233 (1969) ; J. Goldstein, A. Freud, & A. Solnit, *Beyond the Best Interests of the Child* 19, 22, 32, 21, 42, 57 (Free Press 1973) ; R. G. Patton, *Growth Failure*

›

230

now two to three times that age, should not precipitously be exposed to the hazardous uncertainties of such a transfer without any exploration of its probable consequences.

None of this is undercut in the least by the additional factor upon which the Court relies to determine the custody issue, namely, the method of placement, said to have "some impact on the deeper question of whether the custodial claims of the natural mother do not outweigh those of defendants." *Ante* at 224. Assuming that we are to shift our gaze from the child's best interest and focus upon the placement factor, it seems to me that at best the scales come down no more on the side of the plaintiff than on that of defendants. This tragic dilemma was set in motion by plaintiff, who knowingly, unmistakably, and voluntarily undertook to relinquish all parental rights. In measuring her custodial claim I would not think it amiss to hold plaintiff accountable for the consequences of her own conduct. The participation of the physician and attorney is no worse than neutral; in attempting to effectuate plaintiff's express intention they were hardly Svengali-type interlopers. And defendants' sole offense seems to lie in their opening their hearts to the infant, taking him into their home in good faith and refusing to relinquish him when plaintiff changed her mind.

At stake here is nothing less than the destiny and well-being of a non-actor, the innocent child. I think his interests have been badly short-changed and the significant risks attendant upon his transfer overlooked. It is my respectful

*in Maternal Deprivation* 38 (1963) ("The gravest effects of separation are seen between the age of three months and two years and then gradually decrease in severity until the age of 7 or 8 when the child is able to tolerate long periods of separation without any lasting major damage to personal structure.") ; Foster, "Adoption and Child Custody: Best Interests of the Child?", 22 *Buffalo L. Rev.* 1, 13 (1972). See also, Comment, "Termination of Parental Rights in Adoption Cases: Focusing on the Child", 14 *Journal Family L.* 547, 550–58 (1976) ; Comment, "Alternatives to 'Parental Right' in Child Custody Disputes involving Third Parties", 73 *Yale L. J.* 151, 158 *et seq.* (1963).

view that as law the majority's result is aberrational and as social policy it is most unfortunate.

*For reversal and remandment* — Chief Justice HUGHES, and Justices MOUNTAIN, SULLIVAN, PASHMAN, SCHREIBER and HANDLER — 6.

*Dissenting* — Justice CLIFFORD — 1.