**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2907-17T3

IN THE MATTER OF THE ADOPTION
OF A CHILD BY R.C.W. and S.M.W.

_____

Argued May 16, 2018 — Decided August 7, 2018

Before Judges Alvarez, Nugent and Currier.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Monmouth
County, Docket No. FA-24-18.

Matheu D. Nunn argued the cause for appellants
R.C.W. and S.M.W. (Einhorn, Harris, Ascher,
Barbarito & Frost, PC, attorneys; Matheu D.
Nunn, of counsel and on the brief).

Michael B. Farhi argued the cause for
respondent G.R. (Kates, Nussman, Ellis Farhi
& Earle, LLP, attorneys; Michael B. Farhi and
Sandra M. Barsoum, on the brief).

PER CURIAM

This appeal involves the Adoption Act, N.J.S.A. 9:3-37 to —

56. A birth mother brought this action seeking to set aside her

surrender of her newborn to an approved adoption agency and compel

the adopting parents to return her child. Few cases have so much

potential for calamity. The adopting parents could lose their

only child, the child they have nurtured since birth, and in consequence suffer a lifetime of emotional pain and heartbreak. The birth mother could see her decision to surrender her child upheld, have her parental rights terminated, and in consequence suffer a lifetime of regret and sorrow. The child could be abruptly removed from the only parents and only home it has ever known, placed in the hands of a virtual stranger, and in consequence suffer permanent emotional damage.

In this case, following a hearing, and without considering the child's best interests, the trial court nullified the birth mother's surrender and ordered the adopting parents to return the child. The court found the approved adoption agency's non-compliance with administrative regulations concerning counseling of birth mothers amounted to misrepresentation, a statutory exception to the irrevocability of the birth mother's surrender. We conclude as a matter of law the judge erred in so finding. Hence we reverse.

I.

A.

The parties' legal proceedings began in August 2017, when the out-of-state adopting parents, Stephen and Stephanie, filed a complaint for adoption of Baby J, whose mother had surrendered the

child for adoption after its birth the previous month.[1]  In October 2017, two months after Stephen and Stephanie filed the adoption complaint, the birth mother, Mya, a New Jersey resident, filed a verified complaint in the Chancery Division, Family Part, seeking a declaration that her surrender of Baby J to A Loving Choice Adoption Associates ("Loving Choice"), an adoption agency licensed in New Jersey, was invalid.  She also sought an order returning custody of Baby J to her.

The trial court afforded the parties expedited discovery and then conducted a plenary hearing in January 2018.  Following the hearing, the court delivered an oral opinion in which it concluded Mya's surrender of Baby J was invalid.  The court ordered that Baby J — then seven months old — be transferred within fourteen days from Stephen and Stephanie to Mya.  Stephen and Stephanie filed an application for a stay pending appeal.  The trial court denied the stay.  We granted it and accelerated the adopting parents' appeal.

B.

During the hearing on Mya's action, the parties presented the following evidence.  Nineteen-year-old Mya was shocked, confused, and scared when she learned in December 2016 she was pregnant.

---

[1]  We use pseudonyms for the family members, relatives, and friends for purposes of confidentiality and ease of reference.

She was shocked and confused because after terminating two previous pregnancies she "had an IUD put in." According to Mya, her gynecologist told her "there was no chance of . . . getting pregnant with it in." She was scared because even though she had a full-time job, a part-time job, and attended college, she feared she would lose her mother's support. Mya had lived with her mother her entire life.

During the next several months, Mya went back and forth on whether to keep the baby. She decided to surrender it for adoption. Two events cemented her decision. The first occurred when Mya and her mother were packing to return home from their annual trip to South America. Mya had intended to disclose the pregnancy to her mother during the flight back to the States. The morning they packed to return home, Mya's mother said she dreamed she kicked Mya out of the house after learning Mya was pregnant. The dream scared Mya. She did not disclose her pregnancy.

The second event occurred two months later. In April 2017, Mya, her mother, and her grandmother were evicted from the apartment they rented in Union, during a foreclosure action against the owner. No relative had room for the three of them, so Mya's mother and grandmother moved in with Mya's aunt and Mya moved in with her oldest sister, Mariah. Mariah was married with two children. There, from April through October, before she and two

others bought their own home, Mya lived in her nephew's playroom. She had little privacy. She wondered how she could bring a crib into the playroom, and though Mya was managing her finances, her mother was not there to help. Besides, her mother was having financial problems. Mya also could not count on Baby J's father for financial support. He "made it seem" like he had no interest in helping her.

After moving in with her sister, Mya began to research adoption agencies on the Internet. She submitted an online questionnaire to Lifetime Adoption ("Lifetime"), an out-of-state agency. Approximately two weeks after submitting the application, she received a packet from Lifetime with more questions. Mya testified at the hearing that when she completed the packet of questions she was not committed to the adoption "a hundred percent," but "was probably, like [eighty] percent, not even." She then said it was more like fifty percent. Nonetheless, she completed and returned the packet.

In response to questions in the packet, Mya said her family did not know about her pregnancy, she did not plan to tell them, and they would not support her in an adoption plan. Mya also said her friends did not know about her pregnancy, she did not plan to tell them, and they would not support her in an adoption plan.

One section of the packet included questions about her adoption plan. In response to these questions, Mya wrote that the adopting parents and her best friend were allowed in the delivery room. She wrote she would like the adopting parents to spend time with her while she was in the hospital. She did not want to see or hold the baby, but wrote as a special request concerning seeing and holding the baby, "if day I give birth & change my mind they will allow me to." Mya also wanted the adopting parents to send her letters and photos after the adoption, on special occasions, but did not want them to email her often. She requested visits "whenever parents tell child about me."

A question inquired about Mya's reason for placing the baby for adoption. The question was, "What thinking went into your decision to place this child for adoption?" Mya responded, "I wouldn't be able to give the child a good life, I'm too young and I need to finish school."

The questionnaire also inquired about counseling. One inquiry read: "Lifetime offers free peer counseling and confidential licensed counseling from independent providers. Would you like us to schedule counseling at a time that is convenient for you?" Mya checked the circle next to "No."

Mya signed the questionnaire on May 30, 2017. Shortly after she returned it, she received a telephone call from a Lifetime

representative and they spoke for approximately fifteen minutes. A couple days later, Mya received from Lifetime a package containing a "portfolio of parents." A note attached to Stephen and Stephanie's profile said they had been waiting longest. Mya selected them. After speaking to the Lifetime representative again, Mya got a phone number for Stephen and Stephanie and telephoned them.

Wishing to adopt a child, Stephen and Stephanie had contracted with Lifetime in 2014. On June 12, 2017, a Lifetime representative notified Stephanie that a birth mother would telephone them later that evening to discuss a possible adoption. That evening, Mya called and spoke with Stephen and Stephanie.

The three exchanged information about themselves, discussed the birth father, and discussed Mya's support system. Mya mentioned Stephen and Stephanie appeared to have good health insurance and had adorable dogs. She told them nobody in her family knew about her pregnancy, but she had told her new boyfriend and a gym teacher, whom she considered a mentor. Mya told Stephen and Stephanie the date of her next medical appointment and gave Stephanie her cellular phone number.

According to Stephanie, she and Stephen asked Mya "if she wanted to move forward with the match, because that was the point of the phone call, . . . to decide if we would match with each

other. And she said that she had told Lifetime, and she would tell us that she was 100 percent not changing her mind." Consistent with the questionnaire she had completed, Mya also told Stephen and Stephanie she did not want to hold or see the baby when it was born.

During the five weeks between that first telephone conversation and Baby J's birth, Mya and Stephanie exchanged numerous emails. Mya expressed no reservation about the adoption. To the contrary, her emails confirmed she wanted the adoption to proceed without her family knowing about the baby. During the week before Baby J was born, Mya and Stephanie discussed the amount of contact Mya would like to have with Baby J after the adoption. Mya texted:

> Far as contact I wouldn't want a lot of contact with the baby idk if you guys are [going to] tell him/her it was adopted when he/she is older so I wouldn't want to get involved as much I mean I would like to see it before you guys head back . . . when it's born but other th[a]n that I won't want regular contact with it maybe just a picture on holidays and its birthdays. I want to respect your feeling as well as if you guys choose not [to] have it know it was adopted until much older but can always contact me if anything.

Less than a week before Baby J's birth, Mya also texted Stephanie that she, Mya, didn't want to be a ghost to the baby, so if the child ever asked to meet her and it was okay with them,

she would have no problem with such a meeting. Mya said Stephen and Stephanie could put their names on the birth certificate.

Meanwhile, sometime after Mya, Stephanie, and Stephen spoke on June 12, 2017, the Lifetime representative telephoned the Administrative Director of Loving Choice (the "Director"). From that point, Loving Choice provided adoption services to Stephen, Stephanie, and Mya. The Director provided services to Stephen and Stephanie. Loving Choice's Birth Parent Counselor (the "Counselor") provided services to Mya. Keeping their roles separate avoided any possible conflict of interest.

The Director, a co-founder of Loving Choice, completed all required documents for the adoption of Baby J, including documents required under the Interstate Compact on the Placement of Children ("ICPC"). During that process, the Director wrote to the agency involved in Stephen and Stephanie's home state on the day after Baby J was born. The Director informed her counterpart of the birth and said, "[w]e are currently working toward birthmom relinquishing her parental rights." She requested her counterpart have the ICPC agreement signed. The next day, the Director wrote a "To Whom it May Concern" letter stating Stephen and Stephanie were "in legal custody" of Baby J, so they were entitled to have the baby covered under their insurance. Each state approved Baby J's placement with Stephen and Stephanie.

A-2907-17T3

The Loving Choice Counselor, also a co-founder, had been with the organization for fifteen years and provided counseling services to birth mothers for thirteen of those years. In 2011, the Congressional Coalition on Adoption Initiatives honored her with its Angel of Adoption award. Her responsibilities as a Birth Parent Counselor included meeting with pregnant clients considering adoption and counseling them.

Birthparent counseling included "options" counseling. Counseling also included anything troubling a client. The Counselor would inquire about the birth father and what role, if any, he would play in the adoption. She would discuss what would take place in the hospital and file the birth mother's hospital plan. She would oversee the birth mother's transfer of custody of the newborn and offer post-placement counseling.

Loving Choice's Counselor intended to have at least three counseling sessions with Mya. Three sessions was the standard, and she customarily conducted more than three, but the timing and number of sessions varied with each case. Obviously, if a client came to the agency soon after learning she was pregnant, there would be time for more pre-birth counseling sessions than if the client first appeared toward the end of the pregnancy. Post-placement counseling could be one session or fifty sessions over many years.

A-2907-17T3

The Counselor was unable to contact Mya when Loving Choice first became involved, so she left several messages in Mya's voicemail. Mya had taken a vacation to Aruba with her other sister, Miriam. She returned on June 25, 2017, less than a month before Baby J was born. She telephoned the Counselor the next day and they agreed to meet the following Saturday, July 1. They met then and on two other occasions. They gave conflicting testimony about their first telephone conversation as well as what occurred at their meetings.

During their initial telephone call, Mya and the Counselor decided to meet at a Starbuck's near where Mya worked. Mya testified: "And then she asked me if I would be able to meet with her because of the fact that I had to get counseling for the adoption. So I told her okay. And she asked me if we could meet somewhere close to me, at like the Starbucks would be fine." They arranged to meet at Starbucks on July 1, 2017.

The Counselor testified she asked if Mya wanted to come into Loving Choice's office, or if there was somewhere closer to her where Mya would be more comfortable. Mya commented about traffic being heavy and asked if they could meet at a Starbucks near Mya. The Counselor did not know where the Starbucks was. She googled the location. She did not discuss the issue further with Mya, because she was always willing to accommodate any birth mother as

11

to the location for meetings. She agreed to meet Mya at the Starbucks.

They met at Starbucks on July 1 in the morning. Mya said the meeting lasted approximately thirty minutes. The Counselor said it lasted one hour and fifteen minutes. According to Mya, there was a radio on and blenders and espresso machines were operating. People were coming and going, some were talking, others were video chatting while they waited in line for their coffee, and a little girl was "running around a little bit." Mya said the Counselor wrote notes on a little black pad as they spoke.

They discussed Mya's personal interests. The Counselor asked why Mya was considering adoption. Mya explained that she, her mother, and grandmother had been evicted from their home. She felt she was unable to raise a little baby on her own.

Mya said the Counselor related her own experience about adopting. After the Counselor adopted a child, she sent the birth mother photographs on a monthly basis, but the birth mother told her to stop "because it was hurting her, affecting her life."

During the meeting, the Counselor gave Mya papers to sign for the release of medical records. According to Mya, after exchanging personal information, the Counselor relating her adoption experience, and Mya signing papers, the meeting ended.

12                                                    A-2907-17T3

During Mya's trial testimony, in a series of single-word "no" responses to her attorney's questions about this first meeting, Mya said the Counselor did not mention any of the following: foster care, WIC, the Division of Child Placement and Permanency, SNAP, Workfirst New Jersey, Cares for Kids, New Jersey Family Leave Insurance Program, Temporary Assistance for Needy Families, TANF, housing assistance, Section 8, Universal Service Fund, the Housing Choice Voucher Program, or the New Jersey Department of Labor and Workforce Development Housing Assistance program.

Mya also testified the only discussion about adoption alternatives concerned her friend and mentor. She said the Counselor "mentioned something about if I did decide to keep [the baby] to leave [the baby] with my friend, . . . but I told her that [my friend] already had a kid, and I don't think she would be able to do it, so then she just changed the subject." Mya said that was the only alternative the Counselor discussed.

The Counselor recalled things differently. She testified she had Mya confirm the information on the Lifetime questionnaire. After Mya did so, the Counselor inquired about Mya's income and that of her mother, since Mya said she lived with her mother. Mya refused to identify the birth father.

The two then talked about "everything." Mya was proud she was the first person in her family to go to college. They discussed

Mya's interests, which included fashion, makeup, and hair.  They discussed the two previous pregnancies that Mya had terminated "at her mother's behest."

Mya said she could tell no one she was pregnant.  Mya's "mother had been adamant with all three of her daughters, that they were not to be single parents as she had been."  Mya was afraid of her mother.  In fact, when they discussed Mya's hospital plan, Mya asked if she could deliver the baby anonymously.  She wanted to make sure no one could find out she was in the hospital.  To accomplish that, she wanted to be moved off the maternity ward and into another part of the hospital.

During the meeting, they discussed different types of adoptions, including traditional, semi-open, and open.  They also discussed post-placement contact.

The Loving Choice Counselor testified she talked to Mya about alternatives to adoption.  She said:

> [W]e talked about her options[,] which . . .
> were placing the baby in foster care,
> parenting the baby, placing the baby with a
> friend or relative.  And she . . . dismissed
> all of them out of hand.  She said that she
> could not place the baby - - well, I explained
> to her what a - - I explained to her that
> placing - - that as far as I knew, the only
> type of foster care would be through DCP&P,
> and they're our child protective services
> agency.

The Counselor believed some level of abuse or neglect had to be present in order for the Division of Child Protection and Permanency ("DCPP") to become involved. She also told Mya most parents did not consider placing a child with DCPP as an option, "because once the baby went into the system, there you had no choice as to who the baby went with. And you did not know if . . . you would have to do whatever they told you in order to get the baby back."

The two discussed an ongoing concern about Mya seeing a specialist about a problem that could affect the baby's health. The Counselor said she could have an escrow account set up to pay any deductible. According to the Counselor, when the meeting ended, Mya remained absolutely committed to adoption.

The day after the meeting at Starbucks, Stephanie texted Mya: "Hey! Hope your meeting went well yesterday. I wanted you to know we set up an account with Christine to help cover the cost of the specialist! Hope it helps!" Mya responded in a text:

> "Yes everything went well[.] [W]e discussed if I wanted to be in the picture or not and I believe we [are] meeting again next week to discuss my hospital plans. But yes she called me again yesterday to tell me about it and it does[.] [T]hank you I'm really grateful."

At trial, Mya testified that following her first meeting with the Counselor, she remained unsure about the adoption. She "kind

15

of wanted to go through with it, but at the same time . . . was thinking maybe not."  Mya had begun to feel the baby kick and move, and she felt a connection with the child, but "wasn't really certain."  She thought based on what the Counselor had told her, adoption would be the right thing to do.

Mya and the Counselor met a second time at 5:30 on the afternoon of July 11, 2017.  Mya said they met at Starbuck's at the Counselor's suggestion and the meeting lasted approximately thirty minutes.  She testified the Starbucks was a bit more crowded than before.  When Mya and the Counselor spoke, a woman sitting at a nearby table leaned over and tried to listen to them.

Mya recalled the Counselor handed her the birth plan, asked her to fill it out, and said if she had any questions she should ask.  As she completed the form, Mya had questions about whether the adopting parents would be observers and about the room where she would deliver.  The Counselor explained Mya would be admitted to a non-maternity room because no one knew about the pregnancy, so if someone came to the hospital, none of the information would be available as to why she was there.

Mya took approximately ten minutes to complete the form.  When she finished, she and the Counselor discussed some issues concerning her pregnancy and the fact she still was not "showing." The Counselor told her some personal stories and Mya speculated

"she was just trying to make conversation with me." According to Mya, they discussed nothing else at the July 11 meeting.

Asked by her attorney where she was in terms of the 50/50 balance or her thought process, Mya responded that she really wasn't thinking about it in those terms. She was just going with the flow. She was scared because she knew she would be going into labor soon.

The Counselor testified they met at Starbucks on July 11 at Mya's request. The meeting lasted approximately one hour. During the meeting, the Counselor explained she had thoroughly reviewed the information Mya had completed for Lifetime, including Mya's identification of the birth father. The Counselor explained that the birth father would either have to participate in the adoption or be notified about the adoption. Mya said he was a loser, he had not told his family, and she had not spoken with him in months. The Counselor asked if she had reconsidered parenting and whether the birth father would be able to provide child support. Mya dismissed the suggestion out of hand.

According to the Counselor, they again discussed options to adoption. The Counselor asked if Mya had given any more thought to foster care. Mya's answer was no. The Counselor asked if Mya had given any more thought to telling her mother or her sisters. Mya again said no. The Counselor asked if, considering the baby

was Mya's mother's grandchild, her mother might soften up. Mya again said no. Mya gave the Counselor details about her relationship with her sister Miriam and her mother's feelings about Miriam and about her. Mya got emotional when talking about the relationships among her, her mother, and Miriam.

The Counselor again inquired if Mya had given any thought to the birth father, a friend, or a family member parenting the baby. Mya "was again, completely dismissive of every other option." Rather, Mya appeared to be very excited about the identified adoption plan and about meeting Stephen and Stephanie. The Counselor and Mya reviewed the hospital plan. Mya wanted to make sure the baby had the adoptive parents' last name, because she did not want any documentation with her last name on the birth certificate.

Between the second meeting and the day Mya gave birth, the Counselor texted Mya to see how she was doing and to set up another session. Although the two scheduled another session, it did not take place as scheduled, because Mya went into labor.

The day Baby J was born, Mya left work at noon. She gave birth mid-afternoon. The only non-staff person present was Mya's co-worker. When the baby was born, a nurse took the baby to another location. Mya presumed it was the neo-natal intensive care unit. Later, the nurse returned and asked if Mya wanted to

hold the baby. She did. Mya held the baby for approximately fifteen minutes, but then the baby started to cry and the nurse realized Mya did not know what to do. The nurse calmed the baby and placed the baby in its bed, which was in Mya's room.

Between the delivery of the baby and 8:00 that evening, the child's father, his sister, and a friend of Mya visited her. Earlier that day, a friend of Mya texted Stephanie that Mya was in labor. Stephanie arranged to fly to New Jersey and drive to the hospital. When she arrived, the baby's father, his sister, the sister's girlfriend, and Mya's co-worker were in the room. They appeared to be enjoying themselves. Mya was holding the baby. According to Stephanie, Mya "asked if I wanted to meet my [child], and she handed [the baby] to me." Stephanie held the baby from that moment until Mya was discharged that evening. Immediately before her discharge, Mya held the baby one more time then returned it to Stephanie.

Approximately one-half hour before Mya was discharged, Mya handed Stephanie her wrist band. Stephanie thought Mya should stay overnight. When she asked why Mya was leaving, Mya said she had missed dinner with her mother, who was "blowing up" her cell phone trying to locate her. Mya also wanted to sleep in her own bed that night.

Between nine and ten o'clock that night, Stephanie and Mya exchanged text messages.  Mya wished Stephanie a good night with the baby.  Mya said: "I'm so happy for you guys!"  Mya also thanked Stephanie for some small gifts she and Stephen gave to her.

The next evening, Mya met the Loving Choice Counselor in the hospital lobby to sign papers authorizing the baby's discharge to Loving Choice.  Mya signed a document entitled "TRANSFER OF CUSTODY, CONSENT TO ADOPTION, AUTHORIZATION FOR MEDICAL CARE." According to Mya, during the meeting, the Counselor did not discuss options to adoption, government programs, or foster care.  She did not encourage Mya to speak with her mother.  The meeting took only approximately ten minutes.  After accompanying Mya to the hospital's information desk to find out where Mya had to go to sign papers concerning the birth certificate, the Counselor left.

Like the first two meetings, the Loving Choice Counselor recalled things differently.  She had spoken with Mya the previous day after the baby's birth.  She told Mya she did not think it was a good idea for Mya to be discharged from the hospital four to six hours after the delivery.  Mya said she didn't want to raise any suspicions at home, she wanted to sleep in her own bed, and she had to go to work first thing in the morning.

The next day, when the two met in the hospital lobby, the Counselor reviewed the custody forms with Mya.  According to the

A-2907-17T3

Counselor, she once again talked to Mya about options.  The Counselor said to Mya, "now that [the baby's] here, and . . . exists, and you've held [the baby], and spent time with [the baby], and [the birth father] has held [baby] and spent time with [the baby], have you given any more thought of telling your mother?"  Mya said "no."

The Counselor explained that upon the baby's discharge, legal custody of the baby would be transferred to Loving Choice, which would in turn transfer physical custody to Stephen and Stephanie.  The Counselor specifically informed Mya the transfers would not be a termination of her parental rights.  Mya had no questions about the documents she signed or the transfer process.  She was in a hurry to "get upstairs to do what she needed to do, and she had dinner plans with her mother that she said she could not cancel."  The Counselor asked if Mya intended to go up and see the baby and Stephen and Stephanie.  Mya said she did not.  The meeting, which had lasted approximately forty minutes, then ended.

The Loving Choice Counselor took handwritten notes of each meeting with Mya and placed them in Mya's file, a practice she had followed, without exception, with every birth mother she had counseled.  In this case, however, she shredded the notes before testifying at the hearing.  She claimed her notes were illegible, so she typed them and maintained the typewritten version in Mya's

21

file. She acknowledged during her testimony this was the only time she had ever shredded her handwritten notes.

Mya next spoke to the Counselor on July 25. The Counselor texted her in the morning, approximately 8:30 or 9:00, and said she would find an attorney near Mya's home so that Mya and the attorney could discuss the surrender papers. Later that afternoon, at approximately two o'clock, the Counselor texted Mya and asked if Mya would drive to the Loving Choice office because the only attorney available that day was not from Mya's area.

Mya agreed and arrived at Loving Choice at approximately six o'clock that evening. She met the Counselor, who gave her an "Affidavit of Birthmother Regarding Birthfather," which Mya read to herself. The Counselor also presented her with a copy of an "Affidavit in Support of Surrender of Custody and Consent for Adoption." The Counselor discussed some of this document with Mya, but they were interrupted when the attorney arrived. Mya met privately with the attorney, who Loving Choice had contacted many times in the past to counsel birth mothers. Loving Choice paid the attorney's fee.

According to Mya, her meeting with the attorney lasted approximately twenty to twenty-five minutes. The attorney explained she was there to make sure Mya understood what a "surrender" meant and to make sure she was given the correct

22

information about the documents she would sign. No one explained to Mya the relationship between the attorney and the agency. No one informed Mya that she could hire her own attorney.

Mya said the attorney told her that if she had any expenses throughout her pregnancy, such as maternity clothes, the attorney could have the agency billed. The attorney handed Mya a paper to sign, and Mya signed it. Next, the attorney reviewed the surrender document Mya had started to review with the Counselor when they were interrupted.

Mya's attorney testified she became involved with Mya after Loving Choice's Director requested she come to the agency and counsel Mya. The attorney met with Mya once, on July 25, 2017, at Loving Choice. Mya did not sign a retainer agreement. The attorney said Loving Choice had retained her to represent Mya. The agency paid the fee, and the attorney understood it came from the fee the agency charged the adopting parents.

When the attorney met with Mya at Loving Choice, she confirmed Mya had reviewed some documents with the Loving Choice Counselor. Mya did not want to review the documents again. The attorney explained that a birth parent could not sign any documents until at least seventy-two hours had passed since the baby's birth. In Mya's case, this requirement had now been met. Next, the attorney explained that once Mya signed the surrender, her signature would

A-2907-17T3

be irrevocable, that is, the surrender of the baby is permanent "so that if they call the next day to say they changed their mind, it would be too late."

The attorney also explained the procedure by which the adopting parents' names would be placed on the birth certificate; that any agreements with the adopting parents for ongoing contact with the child are unenforceable in New Jersey after the adoption; how agencies investigate adopting parents; and the concepts of physical and legal custody. The attorney explained the concepts of coercion and duress. She explained to Mya no one could force her to sign the documents. She asked Mya if anyone was forcing her to do so.

Last, the attorney asked Mya, "[a]re you ready, then, to go downstairs at this time and sign the papers?" Mya was ready.

Mya and the attorney went to a room and sat with the Loving Choice Counselor and Director. They sat at a table and circulated documents that Mya signed.

Mya testified that as she was signing the documents, she felt she "was kind of being rushed, and like hovered on." The other three adults were telling her where to sign, and to pass each signed document along. No one read anything to her. The other three denied anyone rushed Mya.

24                                          A-2907-17T3

Mya saw the baby twice after it was discharged from the hospital, both times in Stephen and Stephanie's hotel room. After the second visit, Stephen, Stephanie and the baby returned to their home state.

Between the end of July when Stephen and Stephanie returned to their home state with the baby, and September 1, Stephanie and Mya exchanged text messages about the baby. Mya expressed no regrets about the adoption. Rather, she commented that Stephen and Stephanie and the baby made a beautiful family. That changed.

Mya testified that during the third week in August she went to Mariah's home after taking Mariah's daughter to Starbucks. Her mother was at Mariah's house with Mariah's son. Mya began to cry. Her mother and sister asked what was wrong, and Mya told them about the baby and the adoption. A couple days later, Miriam was visiting with Mariah when she saw a medical bill for services to Mya. She asked Mariah about the bill and Mariah told her about the baby.

On September 1, at nine o'clock in the morning, Mya texted Stephanie and asked how the baby was doing. Stephanie responded. That afternoon, Mya's sister, Miriam, texted Stephanie. In her text to Stephanie, Miriam informed Stephanie that Mya wanted the baby back. Stephanie replied to Miriam. Later that day, Stephanie received the following email from Mya:

25

I am so sorry [Stephanie] I really am but it's really killing me not having [the baby] in my life.  I really thought it would be fine and I would be able to go through with it but I can't[.]  I miss [the baby] so much everyday and cry for [the baby] every night.  I hate to do this to you and [Stephen] but I want [the baby] back and I am willing to repay you guys everything you spent . . . and more[.]  I just really want [the baby] back.

The same day, September 1, Mya also wrote a letter to Loving Choice.  She said she wished to revoke the adoption.  She explained why:

I was under the impression that I would have no family support and I did not think I would be able to do it alone.  Since the day [the baby] was born, I felt a complete emptiness inside.  I know that I did the biggest mistake in my life giving [the baby] up for adoption & and I regret it so much.  The guilt was eating me alive that I ended up telling my family what I did.  It was not the easiest discussion but I realized then that I did have the support of my family.

Mya also explained her regret about her decision: "I realize that once I signed those papers there was no turning back and it was irrevocable, but I wish to get [the baby] back.  I was not a hundred percent sure about adoption.  I just felt like it was the right thing to do at the time."

After repeating her regret about the "choice I made," Mya said she did not need the counseling that had been offered to her, but rather needed the baby back in her life.  She apologized for

26

putting everyone through the "whole adoption process" but insisted that the baby be returned.

Mya testified at trial she would not have surrendered the child for adoption and would have discussed the pregnancy with her mother, had the Loving Choice Counselor informed her about the availability of services, counseled her about foster care, and encouraged her to tell her mother about the pregnancy.

Stephen and Mya's sister, Mariah, also testified at the hearing. Their testimony added nothing to the testimony of the other witnesses.

C.

The trial court determined Mya had demonstrated the voluntary surrender should be set aside. In its February 21, 2018 oral opinion, the court concluded Loving Choice had failed to satisfy its regulatory obligations concerning counseling of Mya, and the failure constituted misrepresentation, a statutory ground for setting aside a surrender. The court also found Loving Choice did not substantially comply with the statutory requirement that it offer counseling prior to execution of the surrender.

The court based its decision mostly on its resolution of Mya's and the Loving Choice Counselor's conflicting testimony about what they discussed during their two pre-birth meetings and one post-birth meeting. The court found Mya credible and the

Counselor not worthy of belief, primarily because the Counselor shredded the handwritten notes she made during each of her meetings with Mya. Although the Counselor testified the typewritten notes were verbatim reproductions of her handwritten notes, the court rejected that testimony. In view of the non-existence of the Counselor's handwritten notes, the trial court found "[e]ither there are no notes or those notes are fake." The court emphasized, "that really had a substantial impact on credibility."

The court also cited the Loving Choice Administrator's letters to her out-of-state counterpart and "To Whom it May Concern." The court considered the letters as evidence "it [was] already a foregone conclusion there's been a third counseling session and surrenders are being prepared."

The court reviewed regulations adopted by the Department of Children and Families. The regulations are included in a handbook approved agencies are required to follow. The court found Loving Choice complied with its statutory requirement to inform Mya her surrender was "a surrender of parental rights . . . and means the permanent end of the relationship and all contact between the parent and child." N.J.S.A. 9:3-41. The court also found Loving Choice informed Mya the surrender would constitute a relinquishment of her parental rights in Baby J.

In contrast, the court found Loving Choice did not comply with certain regulations. Most important, the court found these instances of non-compliance. First, Loving Choice did not provide Mya with three face-to-face counseling sessions conducted in a private and professional setting; Starbucks is not a private and professional setting.

Next, the court found Loving Choice did not explore with Mya alternatives to adoption, including temporary foster care, daycare, and care by relatives. The court determined the limited discussion about Mya's friend possibly providing daycare was insufficient.

In addition, the court found the only information the Counselor discussed with Mya about foster care was that Mya "was not a candidate for two reasons": DCPP usually acted only in instances of abuse or neglect; and, parents give up control over the child and the person with whom the child will be placed. The court found this information to be inaccurate and misleading.

Last, the court found Loving Choice did not inform Mya about possible assistance. The court noted Mya was left "uninformed about the opportunities that she might have to receive certain public assistance programs for which she may have qualified." The court found that without exploration of her options, Mya "was presented with false facts related to her options."

29                                          A-2907-17T3

Concluding the regulatory violations constituted misrepresentation, a statutory ground for voiding a surrender, the court nullified Mya's surrender and ordered Baby J be returned to her.

## II.

On appeal, the adopting parents contend the trial court's decision is internally inconsistent and its credibility findings are contrary to the overwhelming weight of the evidence, much of which the court overlooked when it rendered its decision. They also contend the court relied heavily on the Loving Choice Counselor's failure to inform Mya about various public assistance programs, even though there is no "public assistance" requirement in regulations concerning adoption agencies. The adopting parents assert the regulatory violations cited by the trial court do not constitute a statutory misrepresentation sufficient to nullify Mya's otherwise knowing and voluntary surrender. Last, the adopting parents argue Mya did not prove she qualified for any assistance programs or foster care.

Mya responds the trial court's factual determinations are amply supported by sufficient credible evidence on the record as a whole. She asserts the court correctly determined the Loving Choice Counselor's erroneous advice and omissions concerning topics addressed in administrative regulations constitute a

misrepresentation, which is a statutory ground to nullify a surrender. Responding to the argument she did not prove she qualified for any social programs or foster care, Mya contends the adopting parents in the first instance were required to produce evidence she did not qualify for such programs.

### III.

### A.

It is important for the parties to understand the limitations on appellate review of a trial court's decision. An appellate court reviews a Family Part judge's findings of fact and legal conclusions under different criteria. Generally, the judge's findings of fact are binding on appeal if "supported by adequate, substantial, credible evidence." Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). That is so because the trial judge who "hears the case, sees and observes the witnesses, [and] hears them testify, . . . has a better perspective than a reviewing court in evaluating the veracity of witnesses." Ibid. (first alteration in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)). For these reasons, appellate courts

will not reverse a Family Part judge's findings of fact unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ibid. (quoting Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

In contrast, a trial judge "is in no better position than we are when interpreting a statute or divining the meaning of the law." D.W. V. R.W., 212 N.J. 232, 245 (2012). Hence we review questions of law anew. Gere v. Louis, 209 N.J. 486, 499 (2012). A Family Part judge's legal conclusions are entitled to no special deference. In re Forfeiture of Pers. Weapons and Firearms Identification Card belonging to F.M., 225 N.J. 487, 506 (2016) (citing Gere, 209 N.J. at 499).

### B.

The Adoption Act establishes the process for adopting children in New Jersey. In its first section, N.J.S.A. 9:3-37, the Legislature has declared "[t]he act shall be liberally construed to the end that the best interests of children . . . be of paramount concern." This section also requires that "[d]ue regard . . . be given to the rights of all persons affected by an adoption." Ibid.

Importantly, "[a] completed adoption establishes 'the same relationship[ ] . . . between the child and the adopting parent

as if the child were born to the adopting parent.'" In re Adoption of J.E.V., 226 N.J. 90, 100 (2016) (second alteration in original) (quoting N.J.S.A. 9:3-50(b)).  As part of this process, the birth parents' rights must be terminated.  Ibid. (citing N.J.S.A. 9:3-50(c)(1)).  That can occur voluntarily: "A parent may . . . surrender a child to a state-approved agency for adoption."  Ibid. (citing N.J.S.A. 9:3-41(a)).

The Adoption Act defines the term "surrender" as "a voluntary relinquishment of all parental rights by a birth parent . . . for purposes of allowing a child to be adopted."  N.J.S.A. 9:3-38(j).  A surrender must be in writing and properly acknowledged.  N.J.S.A. 9:3-41(a).  Before a birth parent signs a surrender, the approved agency must "inform the [parent] the instrument is a surrender of parental rights . . . and means the permanent end of the relationship and all contact between the parent and child"; "advise the parent that the surrender shall constitute relinquishment of the person's parental rights in or guardianship or custody of the child named therein and consent by the person to adoption of the child"; and "offer counseling to the parent."  Ibid.

With two exceptions, parental surrenders are irrevocable:

> The surrender shall be valid and binding without regard to the age of the person executing the surrender and shall be irrevocable except at the discretion of the approved agency taking such surrender or upon

order or judgment of a court of competent
jurisdiction setting aside such surrender upon
proof of fraud, duress or misrepresentation
by the approved agency.

[Ibid.]

Although the terms "fraud, duress, and misrepresentation" are
not defined in the Adoption Act, they are well-defined in the law.
"Legal fraud or misrepresentation consists of a material
representation of a presently existing or past fact, made with
knowledge of its falsity, with the intention that the other party
rely thereon, and he does so rely to his damage." Foont-
Freedenfeld Corp. v. Electro Protective Corp., 126 N.J. Super.
254, 257 (1973) (citing Louis Schlesinger Co. v. Wilson, 22 N.J.
576, 585-86 (1956)). "In equitable fraud, the second element
(knowledge) is not necessary, but the other four are essential."
Ibid. (citing Dover Shopping Ctr. Inc. v. Cushman's Sons, Inc.,
63 N.J. Super. 384, 391 (App. Div. 1960)). A plaintiff seeking
equitable relief such as rescission may rely upon equitable fraud.
Ibid. (citing Gherardi v. Trenton Bd. of Educ., 53 N.J. Super.
349, 366 (App. Div. 1958)). A misrepresentation must be material
and reliance on a misrepresentation must be reasonable. Gennari
v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997).

Duress consists of moral compulsion, psychological pressure,
or unlawful threats that "overcome the will of the person

threatened, and induce him to do an act which he would not otherwise have done, and which he was not bound to do." Rubenstein v. Rubenstein, 20 N.J. 359, 366-67 (1956). "The age, sex, capacity, relation of the parties and all the attendant circumstances must be considered." Ibid.

A parent attempting to rescind the surrender of a child to an approved agency for purposes of adoption must prove one of the statutory grounds by a preponderance of the credible evidence. Sorentino v. Family & Children's Soc. of Elizabeth, 72 N.J. 127, 133 (1976). Consistent with the Legislative directive that the Adoption Act be liberally construed to promote the best interests of children, when "confronted with the potentiality of serious psychological injury to the child," a court must consider such potentiality at the hearing concerning rescission of a voluntary surrender. Id. at 131-32. Parents

> who seek to change the status quo and to dislodge the child from the only real home [the child] has known, will have the burden of proving by a preponderance of the credible evidence that the potentiality for serious psychological harm accompanying or resulting from such a move will not become a reality.
>
> [Id. at 133.]

The trial court may, in its discretion, "call an impartial expert witness to testify at the hearing." Ibid.

The current Adoption Act, when enacted in 1977, directed the Commissioner of Children and Families to "promulgate rules and regulations relating to the qualification of agencies for approval to make placements for adoption in New Jersey." N.J.S.A. 9:3-40. The statute provides:

> The rules and regulations shall include, but shall not be limited to, standard of professional training and experience of staff, requirements relating to responsibilities and the character of trustees, officers or other persons supervising or conducting the placement for adoption program, adequacy of facilities, maintenance and confidentiality of casework records and furnishing of reports.
>
> [Ibid.]

The implementing regulations are found in the New Jersey Administrative Code, Title 3A, Chapter 50. Chapter 50 is entitled "Manual of Requirements for Adoption Agencies" ("Chapter 50").

The purpose of Chapter 50

> is to prevent the exploitation and to protect the health and well-being of children being served by adoption agencies, as well as to protect the legal rights of children and birth and adoptive parents by establishing standards of agency organization and administration, professional training, experience, practices and requirements relating to the responsibility of agencies providing adoption services in New Jersey.
>
> [N.J.A.C. 3A:50-1.1(a)].

The Chapter

constitutes minimum baseline requirements to ensure that the basic programmatic and administrative needs of adoption agencies and the social service needs of the families and children they serve are met. Compliance with this chapter is necessary if an adoption agency is to open or operate, and no adoption agency is permitted to operate below the level of requirements specified in this chapter. This chapter is in no way intended to prohibit or prevent adoption agencies from going the minimum requirements contained in these rules. The decision whether to exceed these requirements rest with the agencies.

[N.J.A.C. 3A:50-1.1(b)].

Chapter 50 "constitutes comprehensive rules governing the certification of adoption agencies pursuant to N.J.S.A. 9:3-7 et seq." N.J.A.C. 3A:50-1.2

Chapter 50 requires an approved agency to "provide the birth parents and adoptive applicants with a written statement or pamphlet indicating certain parental and agency rights and responsibilities." N.J.A.C. 3A:50-3.4(a). The rights and responsibilities are set forth in N.J.A.C. 3A:50-3.4(b). An approved adoption agency is required to "maintain on file and make available to its clients information on known resources in the community which may be of use to adoptive parents, birth parents, children and adult adoptees." N.J.A.C. 3A:50-5.2(a).

Concerning birth parents, "[t]he agency shall document in the case record all contacts with the birth parents, birth family

members, or their legal representative that directly pertain to the adoption.  All entries shall be signed by the individual and include the date of entry."  N.J.A.C. 3A:50-5.4(a).  Before taking a surrender, the agency is required to document that birth parents were:

1.  Provided at least three face-to-face counseling sessions conducted in a private and professional setting as specified in N.J.A.C. 3A:50-3.7(a), or at the birth parents' home, by qualified social work staff on separate days and that the birth parents were:

i.   Offered counseling that fully:

(1)  Explores alternatives to adoption;

(2)  Addresses any presented emotional problems;

(3)  Includes referrals to mental health agencies when such emotional problems interfere with the birth parents' decision-making regarding adoption; and

(4)  Explores alternative plans for the child, including, but not limited to, temporary foster care, day care and care by relatives;

ii.  Informed that only legal parents or legal guardians have the right to custody and control of their child and to surrender their child for adoption;

iii. Prepared, along with the child, for surrender and separation;

iv. Referred to other community resources when the agency cannot provide needed services;

v. Informed that the agency may contact them in the future if the adult adoptee or adoptive family or emancipated minor requests information or wishes to meet the birth parents;

vi. Advised that they may sign a written agreement at any time indicating their willingness to be contacted and/or to provide information if requested by the adoptee or adoptive family;

vii. Asked to update and submit to the agency their address(es) and/or any significant medical information required on the Medical Information Form, so that the medical information could be shared with the adoptive family and/or the adult adoptee; and

viii. Requested to provide an itemized statement for all adoption-related costs, if any, paid by the prospective adoptive parents prior to agency involvement in the adoption or an affidavit that no money was expended;

2. Requested to sign a statement that indicates either:

i. The agency explained the information in (c)1 above to them; or

ii. They refuse to participate in the counseling sessions; and

3. Asked to sign a statement that indicates the agency explained the

provisions of <u>N.J.S.A. 26:8-40</u>.33 and 40.34, which:

> i. Allow each adoptee and other approved individuals access to original birth certificates;
>
> ii. Allow each birth parent to submit a document of contact preference to the State Registrar; and
>
> iii. Require each birth parent who submits a document of contact preference to submit a family history form; and

4. Advised how to obtain additional information from the Department of Health.

[N.J.A.C. 3A:50-5.4(c).]

The case before us turns on whether the trial court's rejection of the Counselor's testimony, and the court's consequent finding that Loving Choice did not comply with N.J.A.C. 3A:50-5.4(c)(i) and (iv), constituted a misrepresentation sufficient to nullify the surrender.

## IV.

### A.

The Adoption Act begins with the mandate it "be liberally construed to the end that the best interests of children be promoted and that the safety of children be of paramount concern."

N.J.S.A. 9:3-37. We thus begin with the best interests of Baby J. The trial court did not consider them.

In Sorrentino v. Family & Children's Soc. of Elizabeth, 72 N.J. 127, 132-33, (1976), a case involving a parental surrender and the birth mother's action to nullify it, the Court directed the trial court to conduct a hearing as to the child's best interests. The Court emphasized, "[t]he possibility of serious psychological harm to the child in the case transcends all other considerations." Id. at 132. In the case before us, the court and counsel apparently concluded the potential for serious psychological harm to Baby J did not exist. They did so without relying on expert testimony. Rather, they relied on the Supreme Court's pronouncement in Sees v. Baber, 74 N.J. 201 (1977).

In Sees, following a hearing, the trial court issued an opinion and order for judgment when the child whom the mother had given up for adoption was still less than two months old. Id. at 204-05. The child was a year old when the Supreme Court reversed the trial court's decision in favor of the adoptive parents. Id. at 201, 204, 226. The Court in Sees noted the child in Sorrentino was almost three years old. Sees, 74 N.J. at 221. Referring to the three-year-old in Sorrentino, the Court in Sees said:

> It comports with common, human experience that
> a child of that age over such a long period
> of time would have developed a strong and fast

> relationship with the adoptive parents and that there could be serious, perhaps irreparable, harm to the youngster's psyche if that relationship were abruptly and permanently ruptured.
>
> [74 N.J. at 222.]

Continuing, the Court found:

> The insuperable difficulty, however, is that the nature and duration of such psychological damage are imponderable, at least where an infant is involved. There is simply no firm basis to conclude that an inquiry focusing upon the existence of "psychological parenthood," in a case such as this, with an infant just one year old, would be at all helpful or productive in deciding whether that child could not now be raised adequately and decently by his own mother without ruinous psychological trauma.
>
> [Ibid.]

To support this conclusion, the Court cited legal literature, the most recent a 1976 publication. In a dissenting opinion, Justice Clifford cited "literature on this subject" that expressed "serious doubts about the advisability of effecting a transfer of custody after a child has achieved an age of [four] to [six] months." Id. at 229 (Clifford, J., dissenting).

Since Sees was decided in 1977, social science on the issue has progressed and suggests attachment to caretakers forms as early as seven months. See Charles H. Zeanah, Lisa J. Berlin, and Neal W. Boris, Practitioner Review: Clinical Applications of

Attachment Theory and Research for Infants and Young Children, 52 J. Child Psychol. & Psychiatry 819, TB 1 (2011) (showing attachment begins between seven and nine months, with emergence of selective attachment and separation protest behaviors); Frank J. Dyer, Individual Case Studies with Outcomes: Termination of Parental Rights in Light of Attachment Theory: The Case of Kaylee, 10 Psycho. Pub. Pol'y & L. 5, 7-8 (2004).  And:

> In terms of the questions posed to experts in termination cases, it should be noted that there are studies linking disturbed or disrupted attachment to personality disorders (West & Keller, 1994); poor functioning in the parental role as an adult (Quintin & Rutter, 1985); alcoholism (Jones & Moses, 1984); criminality (Bowlby, 1944; Fonagy et al., 1997); and sexual offending (Awad, Saunders, & Levene, 1984).
>
> [Dyer, Individual Case Studies with Outcomes at 11.]

We also note the Supreme Court's recent landmark decision, Bisbing v. Bisbing, 230 N.J. 309 (2017), concerning applications by parents of primary residence to relocate with their children to another state.  There, based in part on developments in social science literature, the Court departed from the previous requirement that a parent of primary residence prove such relocation would not be inimical to the child's interests and announced that henceforth the test would be whether relocation would be in a child's best interests.  Id. at 312-13.

In the case before us, Baby J was seven months old before the court announced its decision. Based upon literature linking severe and permanent psychological damage to disrupted attachment occurring when an infant is as young as seven months old, we question whether the court was obligated to address the issue in order to discharge "its responsibility, as parens patriae of all minor children, to preserve them from harm." Sorentino, 72 N.J. at 132.

The better course would have been to either clarify at the action's outset the party seeking "to change the status quo and to dislodge the child from the only real home [it had] known . . . had the burden of proving by a preponderance of the credible evidence that the potentiality for serious psychological harm . . . resulting from such a move will not become reality"; or in its discretion have an impartial expert witness testify on the issue. Id. at 133. We need not decide whether a remand is necessary, however, because we conclude as a matter of law Mya did not carry her burden of proving fraud, duress or misrepresentation by Loving Choice.

### B.

Preliminarily, we reject the adopting parents' argument the judgment should be reversed because the trial court's factual findings and credibility determinations were against the weight

A-2907-17T3

of the evidence. The argument is certainly not frivolous. Mya's testimony at the hearing was inconsistent with virtually all documentary evidence generated between the date she discovered her pregnancy and the date she signed the surrender. Mya's testimony was also inconsistent with the testimony of virtually every other witness who testified, perhaps with the exception of her sister, Mariah, who knew nothing about the critical events because Mya did not tell Mariah she was pregnant.

As we previously explained, however, an appellate court's function is not to second-guess a trial court's decision or substitute its judgment for that of the trial court. Here, the documentary evidence notwithstanding, the Loving Choice Counselor destroyed her contemporaneous notes of the sessions with Mya. The Counselor offered no rational explanation for her action. The Counselor's conduct provided one of several reasonable bases for rejecting her testimony, testimony that would have established compliance with Chapter 50.

We nevertheless disagree with the trial court's determinations that Loving Choice's non-compliance with their regulatory obligations constituted a misrepresentation sufficient to permit Mya to rescind her surrender. The trial court was careful to point out it did not consider technical regulatory violations misrepresentations. However, under the facts of this

A-2907-17T3

case, the court considered Loving Choice's failure to discuss the possibility of help from social agencies and accurate information concerning the availability of foster care as material misrepresentations.

We agree that not all violations of the regulatory scheme for the licensing of adoption agencies constitute a misrepresentation sufficient to void an otherwise valid surrender. For example, in this case the Loving Choice counselor met with Mya twice at Starbucks and once in a hospital lobby. Indisputably, those locations are not the type of quiet place contemplated by Chapter 50. Nonetheless, non-compliance with that regulatory requirement could hardly be considered a misrepresentation. Besides, there could be circumstances — for example a client's lack of transportation or demands on her time — that would not permit a commute to Loving Choice's office. If an expectant mother is unable to travel or unable to attend a location contemplated by the regulations, it would hardly be in the best interest of the mother, the adopting parents, or the child to not offer counseling for that reason.

On the other hand, other regulations may directly implicate a birth mother's knowing choice to surrender her child to an approved agency. For example, if a hypothetical expectant mother's decision to surrender a child is initially based on her inability

to provide shelter and insurance for the expected newborn, and social programs are available to provide those necessities, non-compliance with the applicable regulations would be tantamount to equitable misrepresentation. The difficulty in this case is Mya's failure to prove key elements of misrepresentation: that a statement was false, material, and reasonably relied upon.

Mya's direct examination illustrates the point. Through a series of questions posed to elicit negative responses and Mya's monosyllabic answers, she established the counselor failed to inform her of the existence of more than ten social agencies. The judge found that to be material. But we fail to discern how such misrepresentations could be material if Mya did not qualify for assistance from any of those agencies. A knowledgeable counselor cannot be expected to provide a birth mother considering adoption with misinformation about the availability of programs.

Mya insists that she would not know if she were eligible for social programs until she applied. In terms of a misrepresentation, however, the focus is narrower. The question is whether the counselor misinformed her. In order to prove that element of misrepresentation, Mya was obligated to show she qualified for the programs.

Mya's burden of proving that she qualified for any program or that foster care was available for her, under her circumstances,

47

would not be particularly difficult to carry. Generally, proofs may be developed through testimony, tangible evidence, or judicial notice. Mya does not contend that a social agency or regulated foster care agency does not have eligibility criteria. A birth mother seeking to rescind an otherwise valid surrender of her parental rights to an approved agency could present the eligibility criteria through the testimony of a knowledgeable person, through introduction of the statutory or regulatory source material, or by asking the court to take judicial notice of such criteria.

Mya's qualification for many of the programs her attorney questioned her about was dubious. She had a job, she had insurance, and it came out during the trial that not long after her surrender she purchased a home with two other adults. Mya did not establish her eligibility for any of the programs about which her attorney questioned her.

Our analysis is the same for her claim that the counselor misinformed her about the availability of foster care. We are unable to discern from the hearing record either that Mya requested the court judicially notice the statutory or regulatory criteria an expectant mother must meet to qualify for such assistance or that the court analyzed such criteria and concluded Mya satisfied it.

That is not to say that the wholesale disregard of the regulatory requirements for a valid surrender of a child to an approved agency for adoption will not constitute fraud or misrepresentation sufficient to nullify a surrender. Importantly, however, in the case before us, the trial court found that Mya was informed and understood that her surrender was a permanent, irrevocable, relinquishing of her parental rights. That finding is fully supported by the record.

Moreover, the record indisputably establishes that Loving Choice offered Mya counselling. Mya admitted the counselor discussed the possibility of daycare with Mya's friend and mentor. And we find no authority to suggest a counselor must repeatedly suggest a birth mother disclose her pregnancy to family members when the birth mother has insisted from the outset on not doing so. For the foregoing reasons, we conclude as a matter of law Mya failed to establish by a preponderance of the evidence that Loving Choice committed equitable fraud or misrepresentation that materially affected her knowing and voluntary surrender of Baby J to Loving Choice. Accordingly, we reverse the trial court's order.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2907-17T3